**Margret A. MULLINS, Appellant,**

v.

**Alice OATES, Appellee.**

No. S–11623.

Supreme Court of Alaska.

Feb. 29, 2008.

Rehearing Denied April 2, 2008.

Margret A. Mullins, pro se, Delta Junction, Appellant.

Kenneth P. Ringstad, Paskvan & Ringstad, P.C., Fairbanks, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

## I. INTRODUCTION

Margret Mullins appeals a final judgment of the superior court terminating her rights and interests in three lots of real property located in Tok. Because the superior court did not err in enforcing the settlement agreement that Mullins ultimately breached, we affirm the superior court's judgment.

## II. FACTS AND PROCEEDINGS

### A. Facts

On November 17, 1997, Margret Mullins contracted with Alice Oates to buy three lots of real property located in Tok.[1] The initial contract for sale provided that the purchase price for these properties was $170,000; the down payment was $5,000; the monthly payment was $600; interest on the principal would accrue at a rate of $6,000 per year or five percent, "whichever is less"; Mullins would maintain a minimum of $60,000 worth

---

1. The initial contract for sale described the real property in the following manner:

 Lots 47B, 47C, 47E3B of the SUBDIVISION OF GOV'T LOTS 3 and 47, WITHIN SECTION 20, T18N, R13E, COPPER RIVER MERIDIAN, ALASKA RECORDS OF THE FAIRBANKS RECORDING DISTRICT, FOURTH JUDICIAL DISTRICT, STATE OF ALASKA....

of insurance on a commercial log structure located on one of the lots; and the price of this insurance would not be deducted from the payments Mullins made to Oates. These terms were to last fifteen years, at the end of which Mullins would pay Oates "any remaining balance of principal and interest." In addition to establishing this particular price and payment scheme, the initial contract for sale also established a three-stage method for transferring title to Mullins. Under the prescribed method, title to one lot would transfer to Mullins after she had paid $30,000 in principal; title to a second lot would transfer after she had paid an additional $50,000; and title to the final lot would transfer after she had paid the remaining amount. Finally, the initial contract for sale established the consequences of a breach by Mullins:

> Should buyer default on this agreement, all title and interest unto any Lots which remain unpaid at the time shall revert to Seller, and all previous interest/principal payments made by Buyer unto Seller under this contract shall be deemed earned by Seller, thereby completely satisfying Seller's damages from Buyer's Default.

Upon execution, the initial contract for sale "immediately" transferred full use and possession of all three lots to Mullins, "with all rental and other revenues from this date forward being the property and possession of the buyer." Mullins was to begin monthly payments to Oates "thirty days from the date of [the contract]."[2]

On June 15, 1998, Mullins and Oates signed an "Addendum to the Contract of Sale," the purpose of which was to set forth "additional items of agreement which were overlooked" in the initial contract. In this addendum, Mullins and Oates set forth two "additional items of agreement," both of which appear to have been intended to clarify past events and unwritten agreements. First, the addendum retroactively clarified that Mullins and Oates had agreed to delay Mullins's first monthly payment "until January 15, with no interest accruing for that free rent period."[3] The addendum explained that this delay in payment was necessary because Oates had—without the knowledge or assent of Mullins—given the business renting space in the commercial log structure permission to forgo paying rent until January 1, 1998. Second, the addendum retroactively clarified that the original asking price for the land had been $160,000 but that Mullins had offered and Oates had accepted an additional $10,000 in exchange for a guarantee that "seller would work with buyer as and when needed, giving buyer leeway without harm to buyer's credit, when necessary, concerning the monthly payments."

On December 11, 2001, Oates, acting through her attorney, sent a letter to Mullins, asserting that Mullins had defaulted on the contract by failing to make payments[4] and failing to provide proof of insurance.[5] On December 28, 2001, Oates, again acting through her attorney, sent a "follow up" letter to Mullins. In this letter, Oates noted that she had not yet received a response from Mullins and threatened to begin legal action to terminate Mullins's rights under the contract if a response was not received within ten days. Mullins asserts that she was away from Tok when these letters were sent and that her response was therefore necessarily delayed. Mullins insists, however, that she did eventually mail a response on January 7, 2002. According to Oates, Mullins's response was never received.

### B. Proceedings

On April 9, 2002, Oates filed a complaint in superior court seeking an order and judge-

---

**2.** Mullins and Oates disagree over who drafted the initial contract for sale. According to Mullins, she and Oates drafted the contract in concert. According to Oates, Mullins drafted the contract by herself.

**3.** The addendum states that under the original contract, Mullins was obligated to begin monthly payments on November 15, 1997. However, the initial contract for sale was dated November 17, 1997 and provided that monthly payments would begin "thirty days from the date of" the contract.

**4.** According to Oates, Mullins's payments for October, November, and December were all past due.

**5.** According to Oates, "[i]mplicit in ... a provision [requiring a buyer to maintain insurance] is the requirement that the seller be provided proof of insurance and be named as an additional named insured."

ment declaring that Mullins's "rights, title and interests in and to the ... real property are foreclosed and title to the ... real property is vested in [Oates] free and clear of any right, title and interest [Mullins] may have." Mullins was served on June 17, but failed to timely appear, file an answer to the complaint, or otherwise defend herself. On July 15 Oates filed an application for entry of default against Mullins for her "failure to plead in or defend the [c]omplaint." Two days later, the court granted this application and entered a default judgment against Mullins.

On August 15, 2002, Mullins filed a pro se pleading in which she moved the superior court to (1) set aside the default judgment; (2) grant her extra time to prepare her pleadings; (3) allow her to file her pleadings by fax; (4) dismiss Oates's complaint against her; and (5) award punitive damages against Oates for frivolously using the court as a means of defrauding and harassing her. On August 28 the superior court granted Mullins's motion to set aside the default but did not decide her remaining motions, other than to rule that she could not file pleadings by fax. On October 8, 2002, the superior court denied Mullins's motions to dismiss the complaint and to award punitive damages. The superior court then entered a pretrial order setting trial for the week of May 26, 2003. On February 19, 2003, the superior court ordered a settlement conference to be held before Standing Master Katherine Bachelder, as mediator.[6]

As ordered, a settlement conference took place on April 4, 2003. During the settlement negotiations, Mullins and her husband and Oates and her attorney were in separate rooms, while Master Bachelder went back and forth between the two parties. After several hours of off-the-record settlement negotiations, both Mullins and Oates went on the record, in open court, and orally agreed to the terms of a settlement. The basic contours of the settlement were as follows: (1) Mullins would make payments to Oates in the amount of $600 per month for the months

of November through May and $1,200 per month for the months of June through October; (2) Mullins would pay an additional $600 to Oates on the first of each month for ten months in order to make up for back payments; (3) payments would be made into an escrow account and escrow fees would be split between Mullins and Oates; (4) the interest rate would be five percent of the unpaid principal balance; (5) after ten years, a balloon payment would come due for the remaining amount of the principal; and (6) Oates would not enter onto Mullins's property or slander Mullins.

On April 7, 2003, the superior court entered a notice of intent to dismiss the case because "the parties [had] reach[ed] a settlement agreement which was placed on the court record." The superior court noted that Mullins and Oates had until May 15, 2003, to file a "good cause objection" to the suit being dismissed. On May 14 Oates requested that the court not dismiss the case until final settlement documents had been executed. Five days later, Mullins also requested that the court not dismiss the case and instead vacate the settlement agreement and reset the case for trial. In her request, Mullins maintained that she had been coerced into accepting the terms of the settlement agreement. According to Mullins, Master Bachelder had erroneously advised her that she would lose her property and would be responsible for Oates's attorney's fees if the case proceeded to trial and that this advice, because she accepted it as true, left her with no other choice but to accept the terms of the settlement agreement. Finding good cause, the superior court declined to dismiss the case at that time.

On August 13, 2003, the superior court issued an order denying Mullins's motion to vacate the settlement and granting Oates's motion to enforce the settlement. According to the order, the superior court's review of the settlement on the record had convinced it that Mullins "freely and voluntarily entered into the settlement agreement." The superior court listed the essential terms of the

---

**6.** Alaska Rule of Civil Procedure 100(i)(3) provides that the court may order a settlement con-

ference "on its own motion."

April 4, 2003 settlement agreement in its order granting the motion to enforce the settlement.

On September 22, 2003, Oates, acting through her attorney, mailed Mullins two original settlement agreements, an original deed of trust, and an original promissory note for review and signature. Mullins apparently refused to sign or return the documents. Instead, over the next month, Mullins filed a number of motions, including a request on October 16, 2003, that the court reconsider its order denying Mullins's motion to set aside the settlement agreement.

On November 12, 2003, Oates, acting through her attorney, sent another letter to Mullins. In this letter, Oates noted that, "under Civil Rule 77(k)(4), if a motion for reconsideration is not ruled upon by the Court within 30 days of the date of the filing of the motion, the motion shall be taken as denied." Oates then pointed out that it had been thirty days since Mullins filed her motion for reconsideration and the court had not yet ruled upon it. Consequently, Oates asserted, Mullins's motion had been denied. Oates requested that Mullins execute the settlement agreement and pay all of her past due payments immediately. Failure to do so, Oates concluded, would result in a material breach of the settlement agreement.

On November 26, 2003, after her original motion for reconsideration had been denied by operation of Alaska Rule of Civil Procedure 77(k)(4), Mullins filed a document entitled "Time is of the Essence Motion to Vacate Settlement Agreement Because It Has Now Been Rejected By Both Parties." In this motion Mullins argued for the first time that the promissory note and deed of trust that Oates had sent to her for review and signature contained a number of terms never mentioned or agreed to at the settlement conference. Mullins then went on to assert that the addition of these terms represented a rejection of the settlement agreement and converted the promissory note and deed of

trust into a counteroffer—a counteroffer that she claimed she was now free to reject. Mullins asked the court to declare the settlement agreement null and void and to stay execution of the agreement until her motion could be heard or appeal taken.

On January 14, 2004, the superior court entered an order in response to several of Mullins's motions. In this order, the superior court denied Mullins's motion to reconsider its earlier order refusing to set aside the settlement agreement.

On March 1, 2004, Oates filed a motion to declare Mullins's title and interests terminated and requested an order requiring Mullins to vacate the property. On July 23, 2004, the superior court entered an order once again rejecting Mullins's contention that her acceptance of the settlement agreement had been the product of coercion, duress, or misrepresentation. The court also rejected Mullins's claim that the promissory note and deed of trust mailed to her for review and signature represented a counteroffer. According to the superior court, these documents did not contain terms that meaningfully deviated from the settlement agreement. The court concluded by noting that Mullins had exhausted her remedies in the superior court and that her proper recourse now was to file an appeal. On September 3, 2004, the superior court issued a final judgment against Mullins. This final judgment terminated Mullins's rights and interests in the property. Mullins now appeals.

## III. STANDARD OF REVIEW

We review a superior court's decision to enforce a settlement agreement under the clear abuse of discretion standard.[7] We review questions of constitutional law de novo.[8] We "may affirm a judgment on any grounds that the record supports, even grounds not relied on by the superior court."[9]

---

**7.** *Barber v. Barber,* 837 P.2d 714, 716 n. 2 (Alaska 1992).

**8.** *Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1049 (Alaska 2002).

**9.** *Van Sickle v. McGraw,* 134 P.3d 338, 341 n. 10 (Alaska 2006).

## IV. DISCUSSION

Mullins's primary claims fall within three general categories: (1) claims that Mullins's acceptance of the settlement agreement was the product of coercion, duress, or misrepresentation; (2) claims that the settlement documents Oates sent to Mullins included a number of terms not previously agreed to at the settlement conference; and (3) claims that the superior court violated Mullins's constitutional rights.[10] We address each of these categories of claims in turn.

### A. The Superior Court Did Not Err in Rejecting Mullins's Claims of Coercion, Duress, or Misrepresentation.

Mullins argues that her acceptance of the April 4, 2003 settlement agreement was the product of coercion, duress, and misrepresentation. According to Mullins, the master overseeing the settlement conference left her with no choice but to accept the terms of the settlement agreement by erroneously advising her that she would secure less favorable terms at trial. An affidavit signed by Mullins's husband and submitted to the superior court characterized the master's advice in the following manner:

> According to Master [Bachelder], there were only three possible outcomes to the case:
>
> The judge could determine, at trial, that the contract was terminated; in such case, the Defendant would be responsible for the Plaintiff[']s attorney's fees.
>
> The judge could reformulate the contract at trial, based on the equity established by Mrs. Mullins during the renova-

tions to the property. However, that process would involve contract changes that would favor Mrs. Oates, to provide the consideration for the reformulation. Again, Defendant would be responsible for the Plaintiff's attorney's fees.

> Or, the parties could negotiate a settlement that would avoid termination of the contract.

The superior court rejected Mullins's claims of coercion, duress, and misrepresentation at length and on at least two occasions. On the first occasion, the superior court noted that it had reviewed the portions of the settlement that had been placed on the record and had found no evidence of coercion, duress, or mistake:

> Master Bachelder stated at the beginning of the hearing that if Mullins disagreed with something, she needed to let the court know. The tape also indicated that Mullins understood the terms and their meaning. She had the opportunity to object to the terms of the settlement agreement as well as the settlement in its entirety. She participated in clarifying terms of the settlement on the record.

The superior court also noted that Mullins's "vague accusations that Master Bachelder told her she would lose" were insufficient to establish any of the elements of duress or misrepresentation. Accordingly, the court held that "Mullins freely and voluntarily entered into the settlement agreement."

When the superior court rejected Mullins's claims of coercion, duress, and misrepresentation for a second time, it did so on the

---

**10.** In addition to these three general categories of claims, Mullins also advances a number of claims that have no basis in law or fact. First, Mullins argues that Oates's original filing of the lawsuit was somehow improper, claiming that the filing of the lawsuit represented a breach of contract and was part of a "bait and switch" fraud. However, this argument goes to the merits of the original lawsuit and the time to raise such an argument expired when Mullins entered into the settlement agreement. Second, Mullins argues that the settlement agreement should be set aside because it did not provide her with any consideration. However, Mullins did in fact receive consideration in the form of Oates's promise to abide by the settlement agreement instead of pursuing the lawsuit. Third, Mullins argues

that Oates failed to establish an escrow account as required by the settlement agreement and that this failure represented a breach of contract that somehow relieved Mullins of her obligation to make monthly payments. However, even assuming that Oates did in fact fail to establish an escrow account, this failure did not represent a material breach of the settlement agreement and therefore did not excuse Mullins's contractual obligations. Moreover, even a material breach would not have allowed Mullins to both retain possession of the real property and avoid making payments. Finally, Mullins argues that Master Bachelder was not an attorney. This, however, is factually incorrect. We take judicial notice of the fact that Katherine Bachelder is a member of the Alaska Bar.

grounds that "Mullins [had] fail[ed] to state how Master Bachelder misrepresented the contract and Alaska law." According to the court:

Mullins merely states that in settlement negotiations Master Bachelder offered her three alternatives: (1) defendant could go to trial, the judge would determine an incurable breach of contract, and defendant would be responsible for attorney['s] fees; (2) defendant could go to trial to have a judge reformulate the contract under principles of equity, defendant would be responsible for additional consideration and attorney['s] fees; or (3) defendant could enter into a settlement agreement. It is unclear from Mullins'[s] motion which part of Master Bachelder's list of alternatives misrepresents the contract or the law.

The superior court reasoned that because the master's advice had accurately reflected the contract and the law, it could not have resulted in any sort of coercion, duress, or misrepresentation.

■ As we have noted on several occasions, "[t]here is a strong public policy in favor of the settlement of disputes."[11] Settlements and settlement hearings facilitate communication and compromise; they encourage litigants to voluntarily resolve their disputes; and "they simplify, shorten and settle litigation without taking up valuable court resources."[12] Accordingly, "private settlements and stipulations ... are to be favored and should not be lightly set aside."[13] Nevertheless, settlement agreements are, at base, merely a species of contract and are therefore binding only if they

"meet minimal contractual requirements."[14] In order to meet these requirements, settlement agreements must be entered into voluntarily and knowingly; they cannot be the product of coercion, duress, or misrepresentation.[15]

■ With these principles in mind, we turn first to Mullins's claims of coercion and duress. As we have previously explained, "[d]uress generally requires a threat that arouses such a fear as to preclude a party from exercising free will and judgment.... Coercion, though not synonymous with duress, is similar and implies compulsion or constraint."[16]

In the case at hand, the record simply does not support Mullins's claims that her free will was overborne by the master's actions. First, the settlement conference lasted over three hours. This suggests that a great deal of time was dedicated to negotiating an agreement that was acceptable to both parties. Second, the superior court's review of the settlement establishes that Mullins agreed to the terms of the settlement that were placed on the record after actively negotiating those terms. During the placement of the settlement on the record, the master instructed Mullins to object if she disagreed with the terms of the settlement.[17] Mullins did not object, but instead affirmatively participated in clarifying and defining several of the settlement's terms, including the date that payments were due, who would be responsible for escrow fees, and the number of deeds that needed to be drawn up. Mullins even demanded that Oates agree to not enter onto her property or slander her again.[18]

---

**11.** *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 98 (Alaska 1984); *see also Murphy v. Murphy*, 812 P.2d 960, 965 (Alaska 1991).

**12.** *Interior Credit Bureau, Inc. v. Bussing*, 559 P.2d 104, 106 (Alaska 1977).

**13.** *DeSalvo v. Bryant*, 42 P.3d 525, 528 (Alaska 2002) (quoting *Henash v. Ipalook*, 985 P.2d 442, 450 (Alaska 1999)).

**14.** *Rice v. Denley*, 944 P.2d 497, 499 n. 4 (Alaska 1997).

**15.** *Indus. Commercial Elec., Inc. v. McLees*, 101 P.3d 593, 597 (Alaska 2004) (noting that settle-

ment agreements are "susceptible to attack for mistake, fraud, misrepresentation, and duress").

**16.** *Crane v. Crane*, 986 P.2d 881, 887 (1999).

**17.** The master told Mullins, "So listen to what he [Oates's attorney] says, and then if there's something you disagree with, then we'll ask you that."

**18.** Based upon the audio recording, it is not entirely clear whether these terms had been agreed to during the extended negotiations or whether they were raised for the first time when the settlement was placed on the record. Either way, the evident firmness with which Mullins demanded these terms belies her claims of coercion and duress.

Under our case law, these observations strongly support the superior court's conclusion that Mullins entered into the agreement voluntarily and of her own free will.[19]

At base, Mullins's argument amounts merely to a complaint that Master Bachelder offered an assessment of the case that cast the option of agreeing to the settlement in a positive light. But it was not improper for Master Bachelder to offer such an assessment. When a mediator attempts to aid a party in reaching a settlement agreement, he or she may legitimately adopt a number of different styles of interaction. A mediator who is conducting a settlement conference may opt to remain entirely neutral and express no opinion about the relative merits of the parties' claims. On the other hand, as one state supreme court has noted, a settlement judge also "acts within the bounds of propriety" when the judge offers an assessment of a case as he or she understands it and recommends a settlement.[20] Indeed, were mediators required to remain neutral or only provide the parties with positive assessments of the relative merits of their cases, it is likely that settlements would be reached less often. Stated another way, a mediator's assessment, even a negative assessment, can at times be beneficial to the parties as they try to reach a settlement agreement.

Given these considerations, as well as Mullins's agreement to the settlement in open court and her active participation at the settlement conference, we conclude that the superior court did not err when it rejected Mullins's claims of coercion and duress.

We turn now to Mullins's claim of misrepresentation. As we have previously explained, a claim of misrepresentation requires proof of four separate elements: "(1) that there was a misrepresentation, (2) which was fraudulent or material, (3) which induced the party to enter the contract, and (4) upon which the party was justified in relying." [21]

According to Mullins, the master advised her of three legal alternatives: (1) go to trial, have the judge determine an incurable breach, and be responsible for Oates's attorney's fees; (2) go to trial, have the judge reformulate the contract in a manner that provided additional consideration to Oates, and be responsible for Oates's attorney's fees; or (3) reach a settlement agreement. We agree with the superior court that none of these alternatives represented a material or fraudulent misrepresentation of the law and conclude therefore that the superior court did not err when it rejected Mullins's claim of misrepresentation.

## B. The Superior Court Did Not Abuse Its Discretion in Rejecting Mullins's Claim of a Counteroffer.

Mullins argues that the deed of trust and promissory note that Oates mailed to her for review and signature contained a number of terms never mentioned or agreed to at the settlement conference. Specifically, Mullins maintains that the documents contained the following changes and additions: "It omitted the incremental title transfer, contained an unconscionable insurance provision, made the

---

**19.** *See, e.g., Pavek v. Curran,* 754 P.2d 1125, 1127 (Alaska 1988) (noting it was proper to conclude that a party was bound by a settlement agreement when that party was present at the hearing, made no objection to the terms of the agreement, and did not in any way indicate that she did not understand the settlement); *see also Ford v. Ford,* 68 P.3d 1258, 1264 (Alaska 2003) (noting that it was proper to conclude that a party was bound by a settlement because that party actively participated in the settlement discussions).

**20.** *Assoc. Fin. Servs. Co. of Hawaii, Inc. v. Mijo,* 87 Hawai'i 19, 950 P.2d 1219 (1998) (internal quotations omitted). Similarly, the Alaska Judicial Council has explained the following:

The mediator's role can take various forms. Some mediators favor a "facilitative" style, encouraging parties to generate their own settlement options and seldom suggesting settlement terms. At the other end of the spectrum are "evaluative" mediators, who will propose settlement options, assess the merits of claims or defenses, predict the likely outcome in court and try to persuade parties to make concessions. Some mediators can use both facilitative and evaluative techniques, depending on what the parties want and what the situation requires.

ALASKA JUDICIAL COUNCIL, MEDIATION, ALTERNATIVE DISPUTE RESOLUTION (ADR) AND THE ALASKA COURT SYSTEM (1999) at 7, available at http://www.ajc.state.ak.us/reports/medguide99.pdf.

**21.** *Bering Straits Native Corp. v. Birklid,* 739 P.2d 767, 768 (Alaska 1987).

balloon payment due in 2003, overcharged Mullins on its calculation of the contract's balance, charged retroactive insurance, and more." According to Mullins, the addition of these terms represented a rejection of the settlement agreement by Oates and converted the promissory note and deed of trust into a counteroffer—a counteroffer that she was free to reject under basic contract law.

The superior court addressed a majority of these alleged changes at length [22] and concluded that none of the settlement documents contained any terms that meaningfully deviated from the settlement agreement. According to the superior court, every allegedly changed or added term was either (1) not actually changed or added, (2) nothing more than a "basic clause[ ] commonly found in contracts," or (3) insignificant. Consequently, the superior court rejected Mullins's argument.[23]

■ A review of the settlement documents reveals that Oates did in fact add at least one term not agreed upon in the settlement conference. The settlement documents proposed an annual interest rate of five percent per year and this interest rate was effectively higher than the interest rate specified in the original contract for sale. Although both parties generally agreed to this increase in interest at the settlement conference, the settlement documents appear to go further than what was agreed to at the settlement conference and attempt to apply this increased rate to interest "due and unpaid from August 12, 2002." In other words, the settlement documents attempt to apply the increased rate to interest that accrued prior to the restructuring of the contract at the April 4, 2003 settlement conference. Apparently, this retroactive increase in the amount that Mullins owed to Oates was never discussed or agreed to by the parties, and, thus, Oates should not have added it to the settlement documents. We have previously condemned these sort of unannounced additions to settlement agreements as "inherently deceptive and wrongful," and we do so again today.[24] Such terms are void.

■ However, although Oates added at least one non-negotiated term to the settlement documents, this term did not convert the settlement documents into a counteroffer. As we noted in *Murphy v. Murphy*, "when a stipulation is recognized in open court ... and filed with the clerk, and there is no dispute as to the material terms of the settlement, the stipulation is enforceable." [25] In other words, both Mullins and Oates were bound to the terms of the settlement agreement that they reached and orally agreed to on the record on April 4, 2004. Under standard contract law, Oates was no more able to change the terms of the settlement agreement or to proffer a counteroffer than Mullins.[26] The settlement—as originally articulated at the settlement conference— remained in effect despite the flawed attempt to insert a new term into the final settlement documents.[27]

Judge Niesje J. Steinkruger's August 13, 2003 order granted Oates's motion to enforce the settlement and set out the basic terms of

**22.** The superior court did not address Mullins's claim that the settlement documents charged her retroactive insurance.

**23.** Mullins contends that the settlement documents submitted by Oates to the superior court and used by the superior court in evaluating Mullins's argument differ from the documents that Oates originally mailed to Mullins. However, it is unclear in what way Mullins believes the settlement documents she received differ from those submitted to the court.

**24.** *Adams v. Adams,* 89 P.3d 743, 749 (Alaska 2004); *see also Pierce v. Pierce,* 949 P.2d 498, 500 (Alaska 1997) (invalidating a term that was added to a document by one party without giving notice to the other party).

**25.** 812 P.2d 960, 965 (Alaska 1991) (explaining our holding in *Interior Credit Bureau, Inc. v. Bussing,* 559 P.2d 104 (Alaska 1977)).

**26.** *See* 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.31 (1993) (noting "[a]n exact and unconditional acceptance of an offer is not afterwards turned into a conditional acceptance so as to invalidate the contract ... by one party's attempt to alter the terms of the contract in some respect").

**27.** *See id.* § 2.9 (noting that when parties intend a writing to merely memorialize a prior contract, "the contract is valid even though they try and fail to agree upon the form and terms of the memorial").

the settlement agreed to by the parties on the record during their April 4, 2003 settlement conference. On September 22, 2003, Oates sent Mullins the settlement documents. Mullins then filed an untimely motion for reconsideration of the order to enforce the settlement on October 20, 2003. The motion for reconsideration made no mention of the non-negotiated terms. Mullins's October 20 motion for reconsideration had, by November 19, been denied by operation of Alaska Rule of Civil Procedure 77(k)(4).[28]

Seven days later, on November 26, 2003, Mullins filed a motion asserting that "time is of the essence" and seeking to vacate the settlement, in which she claimed for the first time that the settlement documents included non-negotiated terms. Mullins was well within her rights to refuse to sign the settlement documents until the error was corrected and to seek assistance from the courts in getting the error corrected. But both Mullins and Oates were obligated to abide by the original negotiated settlement agreement that was placed on the record, particularly since the material terms of the settlement had been set out by the trial court in its order of August 13, 2003, and were not affected by the inclusion of non-negotiated terms in the settlement documents.

Under the oral agreement entered at the settlement conference, which was set out in detail by Judge Steinkruger in her August 13, 2003 ruling, Mullins's immediate obligation was to resume payments to Oates.

She was to pay $1,200 monthly from June to October and $600 monthly from November to May, with ten additional $600 payments for the first ten months to compensate for back payments. At the settlement conference, the parties agreed that these obligations would begin as of June 1 (with payments due on the first and eighteenth of the month). Oates, through counsel, communicated with Mullins twice after the settlement agreement about her late monthly obligations. First, on September 22, 2003, Oates wrote in a cover letter to the settlement documents that Mullins owed $6,000 total in payments from June—September and that "[a]n escrow is being set up at Wells Fargo. Please make all future payments at this account." Second, on November 12, 2003, Oates claimed in a letter to Mullins that she was $8,600 in arrears and requested immediate payment.

 Although the settlement documents applied the increased interest rate retroactively to August 12, 2002, affecting the total amount Mullins would owe over the life of the contract, the inclusion of this non-negotiated term did not affect Mullins's immediate obligation, which was to begin fixed monthly payments after June 1, 2003.[29]

 In sum then, although Mullins was not obligated to abide by any term that Oates added to the settlement documents, she was obligated to abide by the terms negotiated and agreed to at the settlement conference. Mullins failed to do so and ultimately materially breached the settlement agreement.[30]

**28.** Under Alaska Rule of Civil Procedure 77(k)(4),

[i]f the motion for reconsideration has not been ruled upon by the court within 30 days from the date of the filing of the motion, or within 30 days of the date of filing of a response requested by the court, whichever is later, the motion shall be taken as denied.

The trial court also elected to deny this motion in an order dated January 14, 2004.

**29.** Mullins claims that no escrow account was ever established. Oates does not address this argument and there is no evidence in the record that an escrow account was established other than Oates's September 22, 2003 letter, which says one "is being set up." However, Mullins failed to raise this argument in the superior court and therefore it is not properly before this court. *See Olivit v. City and Borough of Juneau,* 171

P.3d 1137 (Alaska 2007); *Jeffries v. Glacier State Telephone Co.,* 604 P.2d 4 (Alaska 1979).

**30.** Mullins also asserts that her claim that the settlement documents resulted in a counteroffer calls into question the existence of the original settlement agreement and that this entitles her, at the very least, to a hearing on the matter. Mullins is correct to point out that she would be entitled to a hearing if a material issue of fact existed as to the existence of the settlement agreement. *See Brooks Range Exploration Co. v. Gordon,* 46 P.3d 942, 944–45 (Alaska 2002). However, Mullins's claim that the settlement documents resulted in a counteroffer does not raise a material issue of fact. As a matter of law, the settlement documents were not a counteroffer. Moreover, it should be noted that Mullins does not appear to have requested a hearing until November 26, 2003—more than three months

### C. Mullins's Constitutional Rights Were Not Violated.

 Finally, Mullins advances a number of constitutional challenges, none of which has any merit. First, Mullins claims that the superior court violated her rights to equal protection and due process by discriminating against her on the basis of age and religion. The only evidence she offers in support of this claim is her own unsupported observation that Oates's "attorney ... mentioned [Oates's] age at the very top of almost every pleading he ... filed." However, this observation, even if true, calls into question not the superior court, but Oates's attorney. Attorneys regularly paint their clients in a sympathetic manner. This is not a violation of any right.

Second, Mullins claims that the superior court was biased against her and that this bias represented a violation of her rights to equal protection and due process. The primary evidence Mullins offers in support of this claim is that the superior court consistently ruled against her motions. Absent more, this evidence tends only to establish that the superior court was not persuaded by Mullins's argument. It does not establish a violation of Mullins's constitutional rights.

Third, Mullins claims that the superior court violated her right to due process when it denied her motion to compel Oates to answer her interrogatories. However, the superior court properly denied this motion since the settlement agreement had already been reached.

Fourth, Mullins claims that the superior court violated her rights to equal protection and due process when it denied her motion to be allowed to fax her pleadings from her home in Tok to the courthouse in Fairbanks. According to Mullins, the postal delivery times between Tok and Fairbanks are so long that she was unable to file her motions in a timely fashion without either (1) mailing her motions well in advance of the filing date or (2) driving her motions to Fairbanks. However, it does not appear that the superior court ever rejected any of Mullins's filings as untimely. As such, Mullins was not denied equal protection or due process of law.

Finally, Mullins claims that lawyers in Alaska are forced to take up residence in urban settings because they cannot file pleadings via fax or email. This, she argues, violates rural Alaskans' constitutional rights by depriving them of easy access to local counsel. However, this constitutional challenge does not appear to have been raised below and, given its scope, was not adequately briefed on appeal. The argument is therefore waived.[31]

## V. CONCLUSION

For the reasons detailed above, we AFFIRM the judgment of the superior court.

BRYNER, Justice, not participating.

---

after the superior court first granted Oates's motion to enforce the settlement agreement.

**31.** *Brandon v. Corr. Corp. of Am.,* 28 P.3d 269, 280 (Alaska 2001) (noting that "[a] party may not raise an issue for the first time on appeal" and "cursory treatment of an issue is considered by this court to be waiver of that issue").