Kenneth L. COLTON, Appellant,

v.

Rebecca K. COLTON, Appellee.

No. S–13188.

Supreme Court of Alaska.

Dec. 23, 2010.

Mary A. Gilson and Allison E. Mendel, Mendel & Associates, Anchorage, for Appellant.

Leigh Ann Bauer, Law Offices of Leigh Ann Bauer, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

Former spouses reached agreement on property distribution and put the agreement on the record. The agreement required the husband to make a cash payment to the wife. The superior court issued findings and conclusions memorializing the agreement and subsequently rejected the husband's request to set the agreement aside. The husband appeals, arguing that (1) the superior court clearly erred in finding that the husband agreed to make the payment because he did not understand that it would result in an unequal property division, and (2) the superior court abused its discretion in enforcing the agreement because it was made without the

husband's full understanding. We conclude that the court did not clearly err in finding that the husband agreed to make the payment. We also conclude that the superior court did not abuse its discretion in enforcing the agreement because the husband did not point to facts showing it was made without his full understanding. Thus, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

After 20 years of marriage, Ken and Rebecca Colton separated and began divorce proceedings. On April 21, 2008, the parties engaged in court-assisted settlement negotiations. Both Ken and Rebecca were represented by counsel. The parties reached a global agreement on all child custody and property division issues and put it on the record the same day. In this appeal, Ken argues that the agreement is unenforceable because it does not reflect a meeting of the minds. The disputed item is a $47,121.04 cash payment from Ken to Rebecca.

### A. Settlement On The Record

At the start of negotiations, Ken and his attorney provided the court with a document called the "Revised Settlement Spreadsheet" ("Ken's spreadsheet"), a list of all assets and liabilities to be divided between the parties.[1] Ken's spreadsheet placed a value on each item and assigned each item to either Ken or Rebecca. Adding up the values by column, Ken's spreadsheet showed the "Total Assets and Debts" of the parties as $319,287.18 for Ken and $413,529.28 for Rebecca. Below this appeared an item called "Payment to Equalize"; on this row, $47,121.04 was *added to Ken's column* and the same amount was

*subtracted from Rebecca's column*. Below this, Ken's spreadsheet listed the ultimate "Total," including the equalization payment, as $366.408.22 for each party.

Although all settlement talks took place off the record, it is clear that Ken's spreadsheet played a large part in the negotiations. When the settlement was put on the record later that afternoon, the court said, "the parties and I have been working principally off" Ken's spreadsheet in crafting the settlement. When the court recited the agreed-upon distribution of several major items—the marital residence, vehicles, lawsuit proceeds, insurance, and retirement plans—the distribution matched that provided on Ken's spreadsheet. The court also stated that "all the rest of the property as reflected on [Ken's spreadsheet] and all of the personal property as previously indicated on [Ken's] personal property spreadsheet . . . will each respectively go to the . . . spouse indicated. . . . Then in terms of the debts, they're going to be divided as indicated on" Ken's spreadsheet. Finally, the court said "at the end of the day to make a payment to ultimately settle the case . . . *[Ken] has offered and [Rebecca] has accepted to receive a payment of $47,121.04 upon the refinancing of the marital home.*"[2] Assuming that this means that Ken has offered *to pay $47,121.04 to Rebecca,*[3] this is the opposite of the "Equalization Payment" item from Ken's spreadsheet, which showed the same amount being paid to Ken from Rebecca. Neither Ken nor his attorney objected. In a brief exchange that followed, the court asked Ken whether he could refinance the marital home within 60 days. Ken promised he would try, and the court said: "If you come into a glitch in any respect that looks like it's going to cause delay, let [Rebecca] know, just so

---

1. The front page of Ken's spreadsheet reflected the proposed settlement as a whole and listed each major asset and liability separately, except for personal property which it lumped into two categories: "Personal Property Over $100" and "Personal Property Under $100." The personal property in those categories was broken down item by item on the following six pages.

2. (Emphasis added.) We note that this sentence was phrased somewhat ambiguously, and could

be interpreted as meaning "Ken has offered . . . to receive a payment" from Rebecca. However, Ken concedes that the court meant that Ken offered to pay, and Rebecca agreed to receive. Further, any ambiguity is resolved by the court's subsequent statements that Ken should refinance the home in order to get the cash to pay Rebecca.

3. *See supra* note 2.

that [she's] not on the 59th day expecting to receive a check...." Again, neither Ken nor his attorney objected.

Although the court made frequent reference to Ken's spreadsheet, it made clear that the parties were not adopting the spreadsheet wholesale; specifically, the court emphasized that the parties could not come to agreement on the values of particular items, but rather had agreed to disagree on values and settle on the basis of an item-by-item distribution.

The attorneys questioned their clients regarding the settlement agreement. Both Ken and Rebecca agreed that they understood the settlement as it had been put on the record, that they entered into the settlement voluntarily, that they knew it was final and binding, and that they believed it to be fair and equitable. Ken agreed that the court's recitation of the terms was a "fair and accurate description of what [he] agreed to." The court concluded by finding that both parties had made "knowing, reasonable and voluntary decisions" and that the property division was "fair and equitable." The court asked that Ken's attorney prepare findings of fact and conclusions of law and attach as an appendix "the final version of the property spreadsheet that you submitted today which we were working from, as well as the supplemental or backup spreadsheet that indicated all the items of property and the distribution thereof, understanding that the parties have agreed to disagree with respect to specific values...."

### B. Findings Of Fact And Conclusions Of Law

Upon reviewing the materials in preparation for drafting the final documents, Ken's attorney says she noticed for the first time that an "error" had occurred. In putting the settlement on the record, the court said that Ken was to make a $47,121.04 payment to Rebecca; according to Ken and his attorney, this was "inconsistent with the spreadsheet adopted by the parties"—which showed the same payment flowing in the opposite di-

rection—and the attorneys' failure to correct the error on the record was a mutual oversight. Ken's attorney contacted Rebecca's attorney and tried to resolve the discrepancy. It is unclear whether Rebecca's attorney responded, but she later stated her position that the settlement on the record was an accurate reflection of the parties' agreement, that the parties had discussed the deviation from Ken's spreadsheet during the settlement negotiations, and that Ken's objections were simply "buyer's remorse."

On June 2, 2008, Rebecca's attorney filed proposed findings of fact and conclusions of law because Ken's attorney had not done so by the court's deadline. The proposed findings and conclusions repeated the property distribution as it had been recited on the record and also cross-referenced each asset or liability with its appearance on Ken's spreadsheet. The proposed findings included this provision:

> *Equalization Payment and Refinance of Marital Residence:* [Rebecca] shall receive the ... $47,121.04 cash from [Ken] ... on or before June 21, 2008, from [Ken's] refinance of the marital residence to equal the distribution of the marital estate between the parties, identified as the next to the last line listed as "Payment to Equalize" on [Ken's spreadsheet].

Of course, the next-to-last line on Ken's spreadsheet, labeled "Payment to Equalize," actually provided for Ken to receive this payment from Rebecca. The proposed findings further stated:

> The parties' original Property Settlement Agreement, evidencing their agreement of the distribution of the Marital Estate, is hereby incorporated by reference into the Findings, and as fully set forth herein. The parties' [sic] stipulated and agreed to annex [Ken's spreadsheet] to these Findings, which sets forth the equitable distribution of all personal property, which this Court has incorporated by reference into the Findings.

Annexed to the proposed findings was Ken's spreadsheet, including the overview page and

the supplementary personal property breakdown spreadsheets.

Ken promptly objected to Rebecca's proposed findings. He described the alleged error and argued that "there was not a meeting of the minds for settlement purposes." The court adopted Rebecca's proposed findings and conclusions in their entirety, including the requirement that Ken pay Rebecca $47,121.04.

### C. Rebecca's Motion For Order To Show Cause And Ken's Motion For Reconsideration

The deadline passed for Ken to refinance the house and make the cash payment to Rebecca. Rebecca moved for an order to show cause. Ken responded that the findings and conclusions were internally inconsistent because the terms on Ken's spreadsheet varied from the terms recited on the record, and that he would be irreparably harmed if forced to refinance the home to pay an amount that he may not owe. The court held an expedited hearing on the motion for order to show cause. Rebecca's attorney argued that the transcript showed unambiguously that Ken had agreed to pay Rebecca: Ken did not object on the record when this term was recited, he stated that he could refinance within 60 days in order to make the payment, and he affirmed that he understood and agreed to the recited terms. Rebecca's attorney also made an argument related to off-the-record settlement negotiations, but the

court admonished that it could not consider such discussions.[4] The court ultimately held in abeyance whether to grant an evidentiary hearing on the motion for order to show cause, but said that

> based on the transcript . . . it's pretty clear that the parties made an agreement . . . to disagree regarding the values, and instead they distributed the property the way that they chose. . . . [M]ost importantly, [Ken] made this offer [to pay Rebecca]. . . .

Ken moved for reconsideration. He argued that if he was truly required to pay Rebecca $47,121.04, it would effect a distribution of 63% to Rebecca and 37% to Ken, yet "there was no discussion on the record" of this disparity.[5] Further, Ken argued that it was "bizarrely coincidental" that "the exact amount needed to make the distribution equal, a $47,121.04 payment to Ken, is alleged to be the exact amount the parties agreed that Ken would pay to Rebecca." Ken did not submit any affidavits in support of his motion. In opposing Ken's motion, Rebecca again emphasized the clarity of the record with regard to Ken's agreement to pay. In support of her opposition, Rebecca submitted the affidavit of her accountant, Paul Wichorek, who was present during negotiations and who corroborated Rebecca's version of events.

The court denied reconsideration, stating that "[t]he transcript of the parties' settlement clearly shows that the parties agreed to disagree regarding the valuation of assets

---

4. Rebecca's attorney said:
 [W]hen we were in chambers I remember distinctly you [Judge Stowers] . . . looked at both [Ken's attorney] and I and said, okay, so there's $47,121, that's the . . . equity in the house to equalize, and we were talking about the volatility of assets, that basically [Rebecca] was getting a lot of . . . money from a 401(k) that was volatile and [Ken] was getting the stable asset, which was the home, and I remember you saying which way is this money going and you kind of did . . . arrows both ways with your hands . . . and [Ken's attorney] said unequivocally we understand that $47,121 is going to [Rebecca]. . . . [T]his whole issue . . . was on the table the entire time. There is absolutely no discrepancy, there was a meeting of the minds. . . ."

The court responded that it had to "disregard and [did] disregard the discussion that went on during the settlement itself," because it was "mandatory that we don't get into a situation where lawyers make each other or the judge a witness to these things." The court stated that it would only consider the testimony on the record.

5. As discussed below, Ken concedes that the parties did not come to agreement on the values of particular items and instead agreed to an item-by-item distribution. Therefore, the percentages Ken cites here result from a calculation based on his own personal valuations.

and instead agreed to settle on the basis of the terms set forth in the [findings of fact and conclusions of law] and on the record."[6]

Ken appeals.

## III. STANDARD OF REVIEW

We review a superior court's decision to enforce a settlement agreement for abuse of discretion[7] and will reverse only if a review of the entire record leaves us with a definite and firm conviction that the superior court has erred.[8] In making this inquiry, the standard of review is necessarily intertwined with the substantive law governing settlement agreements.[9] We review the factual findings underlying the superior court's decision for clear error.[10] We use our independent judgment to review whether a superior court's findings are sufficiently detailed to permit meaningful review on appeal.[11]

## IV. DISCUSSION

Ken argues that the superior court clearly erred in finding that mutual assent was reached regarding the $47,121.04 payment and should have held an evidentiary hearing before summarily enforcing the agreement. Further, Ken argues that it was an abuse of discretion to enforce the agreement because the facts showed it was made without Ken's full understanding. Alternatively, Ken argues that the court's findings of fact are internally inconsistent, thus precluding meaningful review by this court. Rebecca responds that Ken's agreement to pay her $47,121.04 is fully supported by the record. And she argued to the superior court that Ken's belated objection to this requirement is simply "buyer's remorse." At oral argument, Ken's attorney clarified that Ken is asking this court to vacate the superior court's decision and remand for trial, and is not advocating a remand for purposes of conducting an evidentiary hearing to determine the terms and existence of the agreement.

### A. The Superior Court Did Not Abuse Its Discretion By Enforcing The Settlement Agreement.

Ken argues that the settlement agreement is unenforceable because there was "no meeting of the minds" about who was supposed to pay the $47,121.04.[12] In his briefs to this court, Ken explained that although he did not object when the court stated that he would pay Rebecca, he did not realize at the time that the court had deviated from the terms on the spreadsheet. Because he understood the spreadsheet terms to be controlling, and because he was unaware that the court's recitation conflicted with the spreadsheet, Ken argued that he did not knowingly agree to pay Rebecca. From this explanation, it initially appeared to be Ken's position that both parties had agreed Rebecca would pay Ken, that the court had mistakenly transposed the payor and the payee in reciting this term on the record, and

**6.** Rebecca subsequently filed another motion for an order to show cause why Ken had not paid and the court decided to impose sanctions. Ken then refinanced the house, but also moved for a stay of judgment pending appeal and reconsideration of the sanctions. The court denied the motion for a stay pending appeal, but granted the motion for reconsideration of sanctions. The court said it would hold an evidentiary hearing on the sanctions issue, but held the hearing in abeyance pending the outcome of this appeal.

**7.** *Mullins v. Oates*, 179 P.3d 930, 935 (Alaska 2008); *Worland v. Worland*, 193 P.3d 735, 738 (Alaska 2008).

**8.** *Ford v. Ford*, 68 P.3d 1258, 1263 (Alaska 2003).

**9.** *Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996) (quoting *Murphy v. Murphy*, 812 P.2d 960, 965 (Alaska 1991)).

**10.** *Barber v. Barber*, 837 P.2d 714, 716 n. 2 (Alaska 1992).

**11.** *See, e.g., Sullivan v. Subramanian*, 2 P.3d 66, 69 (Alaska 2000); *Sloan v. Jefferson*, 758 P.2d 81, 86 (Alaska 1988); *Johnson v. Johnson*, 544 P.2d 1028, 1029 (Alaska 1976); *Wigger v. Olson*, 533 P.2d 6, 7–8 (Alaska 1975).

**12.** After denying reconsideration of its findings and conclusions, the court enforced the settlement agreement. It confirmed Ken's obligation to pay Rebecca.

that the failure of Ken and his attorney to object was mutual oversight. Such a position would have been consistent with (1) the frequency with which the court referenced Ken's spreadsheet, (2) the fact that the distribution of all other assets matched the distribution indicated on the spreadsheet, (3) the court's failure to acknowledge the departure from the spreadsheet with regard to responsibility for this payment, (4) the fact that the amount of the payment was identical—down to the penny—to the payment listed on the spreadsheet, and (5) the fact that Ken's attorney raised the issue in a reasonable time before the findings and conclusions were finalized. We note that evidence also exists to support Rebecca's position that the deviation from the spreadsheet was intentional, including (1) the failure of Ken and his attorney to object on the record, (2) Ken's affirmative participation in discussing refinancing the home in order to pay Rebecca, and (3) the affidavit of Rebecca's accountant corroborating her position. Given these discrepancies, it is possible we would have remanded the case for an evidentiary hearing to determine whether a mistake had been made.[13]

At oral argument, however, Ken's attorney conveyed two important clarifications. First, Ken does not argue on appeal that there is a factual dispute which should be remanded for an evidentiary hearing. Rather, Ken argues that the agreement is unenforceable as a matter of law, and that the only appropriate remedy is to remand for trial. Second, Ken's attorney clarified that when putting the settlement on the record, Ken actually *did* understand that he was agreeing to pay Rebecca $47,121.04. The only thing he did not understand was the "effect" of that agreement; specifically, he "didn't know it was going to result in an unequal property division." Ken concedes that, because the parties "agreed to disagree" about the values of specific items, the "inequality" of the property division is Ken's personal opinion. Thus, we understand it to be Ken's argument that, although he intentionally and knowingly agreed on the record to pay Rebecca $47,121.04, this agreement should not be enforced due to his unspoken misgivings about the subjectively perceived consequences of his decision.

■■■ Alaska recognizes a "strong public policy in favor of the settlement of disputes."[14] Settlement agreements facilitate communication and compromise, encourage voluntary resolution of disputes, and simplify litigation without taking up valuable court resources.[15] As we have frequently stated, settlement agreements "should not be lightly set aside."[16] However, settlement agreements are, at base, merely a species of contract and therefore must meet basic contractual requirements,[17] including "an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound."[18] An essential requirement of an enforceable

---

**13.** A superior court may not summarily enforce a settlement agreement if there is a genuine dispute of material fact as to the terms or existence of the agreement. *Brooks Range Exploration Co. v. Gordon,* 46 P.3d 942, 944–45 (Alaska 2002). We review the decision to summarily enforce a contested agreement de novo and will affirm only if we conclude that there is no issue of material fact and the agreement is valid as a matter of law. *Id.* at 945. *See also Gablick v. Wolfe,* 469 P.2d 391, 394 (Alaska 1970) (reformation may be sought where a mutual mistake, or a unilateral mistake of which the other party knows, occurs in a writing which is to evidence the parties' agreement).

**14.** *Mullins v. Oates,* 179 P.3d 930, 937 (Alaska 2008). *See also Interior Credit Bureau, Inc. v. Bussing,* 559 P.2d 104, 106 (Alaska 1977).

**15.** *Mullins,* 179 P.3d at 937.

**16.** *Id. See also Wooten v. Hinton,* 202 P.3d 1148, 1155 (Alaska 2009); *DeSalvo v. Bryant,* 42 P.3d 525, 528 (Alaska 2002); *Henash v. Ipalook,* 985 P.2d 442, 450 (Alaska 1999).

**17.** *Mullins,* 179 P.3d at 937; *Walton v. Ramos Aasand & Co.,* 963 P.2d 1042, 1045–46 (Alaska 1998).

**18.** *Crane v. Crane,* 986 P.2d 881, 885 (Alaska 1999) (quoting *Davis v. Dykman,* 938 P.2d 1002, 1006 (Alaska 1997)).

settlement agreement is the parties' mutual assent to the agreement's terms.[19] The mutual assent requirement "cannot be defeated by the unexpressed subjective intent of one of the parties; rather, it must rest on an objective manifestation of mutual intent regarding the essential terms of the contract."[20] In other words, a party's "mental reservation[s]"[21] and "unexpressed intentions"[22] will not supercede the party's outward expressions of assent.

Here, Ken does not dispute that the settlement agreement complies with the basic contractual requirements: essential terms, consideration, intent to be bound, and unequivocal acceptance. The only disputed element is mutual assent regarding the $47,121.04 payment.[23] Ken asserts that mutual assent is lacking because, although he understood he was agreeing to pay Rebecca, he did not understand that the "result" or "effect" of this agreement would be an "unequal property division," in terms of his personal valuations. However, Ken points to no objective evidence that his assent to the agreement was contingent on the result being an "equal" division. Rather, all objective evidence points in the opposite direction. In "agreeing to disagree" on the values of specific items, the parties implicitly rejected the very concept of an "equal division." Ken and his attorney were present when the court recited on the record, item-by-item, the terms of the agreement. Neither Ken nor his attorney stated any objection or qualification that the agreement was premised on a particular "bottom line" calculation. In addition, Ken testified as follows in response to questioning by his attorney:

Q: [You] entered into lengthy negotiations [about] property and you've heard the Judge recite the terms. Do you believe that that's a fair and accurate description of what you agreed to?

A: Yes, it is.

Q: And do you believe that it's a fair and equitable distribution of your marital estate?

A: Yes, it is.

Q: And do you feel like you had enough time to discuss those property negotiations with me?

A: Yes.

. . .

Q: [D]o you understand that this is a final and binding agreement and that you can't come back tomorrow or later on tonight and change your mind?

A: Yes, I do.

If Ken had any expectation that the agreement would result in an "equal division" under his valuations, he did not make this expectation known. Under established contract principles, Ken's unexpressed inten-

---

**19.** *Walton,* 963 P.2d at 1045–46. *See also Young v. Hobbs,* 916 P.2d 485, 488–89 (Alaska 1996) (vacating settlement agreement where parties never reached meeting of the minds with regard to material term); *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1281 (Alaska 1985) ("Mutual assent is an elementary requirement for a binding contract.").

 *Black's Law Dictionary* defines "mutual assent" as the concept that "both parties to an exchange shall have a reasonably clear conception of what they are getting and what they are giving up." BLACK'S LAW DICTIONARY 124 (8th ed. 2004) (quoting MARVIN A. CHIRELSTEIN, CONCEPTS AND CASE ANALYSIS IN THE LAW OF CONTRACTS 66 (1999)).

**20.** *Howarth v. First Nat'l Bank of Anchorage,* 596 P.2d 1164, 1167 n. 8 (Alaska 1979). *See also Zeman,* 699 P.2d at 1281 ("A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe" that agreement had been reached.); *Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 116 (Alaska 1990); C.J.S. CONTRACTS §§ 35–36, 38 (2010) (mutual assent determined by objective standard, such as by apparent intention of parties as manifested by their actions).

**21.** RESTATEMENT (SECOND) OF CONTRACTS § 17 cmt. c (1981).

**22.** 17A AM JUR 2D *Contracts* § 33 (2010).

**23.** Ken uses the term "meeting of the minds." "Meeting of the minds" and "mutual assent" are often used interchangeably, and refer to the same concept. RESTATEMENT (SECOND) OF CONTRACTS § 17 cmt. c (1981).

tions and mental reservations do not override his objective and unequivocal manifestations of assent to the terms of the agreement.

 Ken further argues that superior court erred in enforcing the agreement because it was "not made with full understanding." Again, we disagree. Where a settlement agreement relating to the division of property meets basic contractual requirements, it should be enforced, absent "fraud, duress, concealment of assets or other facts showing the agreement was not made voluntarily and with full understanding."[24] In determining whether circumstances for avoiding enforcement exist, a party's active negotiation of settlement terms, affirmative participation in clarifying terms on the record, and failure to object despite the opportunity to do so are relevant considerations.[25] Here, Ken and his attorney were present for and participated in lengthy, court-assisted negotiations. Ken did not object when the court stated that he had agreed to pay Rebecca, he actively engaged in conversation about the mechanics of making the payment, and he subsequently testified that he understood and agreed to the terms as they had been recited. Clearly, Ken understood that he agreed to pay Rebecca $47,121.04. This is a sufficient basis for us to conclude that the superior court did not abuse its discretion in enforcing the agreement.

However, even if we go further and consider Ken's argument, he has pointed to no facts showing he lacked "full understanding" of the "effect" of his decision. Ken had the time and resources at his disposal to easily understand the consequences of his agreement.

He went into negotiations with a spreadsheet which assigned values to property, divided property a certain way, included a $47,121.04 cash payment *from Rebecca to Ken*, and resulted in an "equal" division. The negotiations culminated in an agreement which divided property exactly as the spreadsheet divided it except for the cash payment, which now flowed *from Ken to Rebecca*. At oral argument, Ken's attorney could not explain how, given these facts, Ken could possibly have misunderstood that the bottom line calculation would also change, nor did Ken submit an affidavit to the superior court explaining his misconception. Because public policy favors the settlement of disputes, and because parties must be able to rely on the enforcement of agreements to settle, we have repeatedly said that settlement agreements should not lightly be set aside.[26] Here, the parties' agreement satisfies basic contractual requirements and the facts contained in the record do not indicate it was made without full understanding. Thus, we conclude that the superior court did not clearly err in finding that Ken agreed to pay Rebecca $47,121.04, and did not abuse its discretion in enforcing the agreement.[27]

## V. CONCLUSION

For the reasons above, we AFFIRM the decision of the superior court.

EASTAUGH, Justice, not participating.

---

24. See *Murphy v. Murphy*, 812 P.2d 960, 965 (Alaska 1991).

25. See *Mullins v. Oates*, 179 P.3d 930, 937–38 (Alaska 2008) (rejecting duress claim because appellant participated in negotiations and clarified terms on record); *Pavek v. Curran*, 754 P.2d 1125, 1127 (Alaska 1988) (affirming determination that party intended to be bound because she did not object when her attorney confirmed the agreement in open court).

26. See *Mullins*, 179 P.3d at 937.

27. In his briefs to this court, Ken made the alternative argument that the superior court's findings were insufficiently detailed to permit meaningful appellate review. Ken based this argument on the court's failure to address the apparent contradiction between its finding that Ken agreed to pay Rebecca $47,121.04, and its finding that the parties agreed to incorporate by reference Ken's spreadsheet, which showed the payment flowing in the opposite direction. In light of Ken's clarification at oral argument that he does not actually dispute that he agreed to pay Rebecca, we need not consider this argument.