Charles B. WORLAND, Appellant,

v.

Jacqueline K. WORLAND, Appellee.

No. S–12746.

Supreme Court of Alaska.

Sept. 26, 2008.

Herbert A. Viergutz, Law Office of Herbert A. Viergutz, Anchorage, for Appellant.

Timothy P. Peters, Law Office of Timothy P. Peters, LLC, Anchorage, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, CARPENETI,
and WINFREE, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Charles Worland appeals the superior court's enforcement of his property settlement agreement with his former wife, Jacqueline Worland. Charles argues that the parties' settlement conference failed to generate an accord and that therefore the superior court should have granted his request to proceed to trial. Charles also challenges the superior court's property distribution and its decision to award attorney's fees to Jacqueline. Because the parties reached an enforceable settlement agreement on the division of their property, and because Charles unreasonably protracted the implementation of that agreement, we affirm the superior court's rulings in all respects.

## II. FACTS AND PROCEEDINGS

Jacqueline and Charles Worland, both Alaska residents, married on March 20, 1982 in Herman, Minnesota. They have three adult children. The Worlands separated on February 17, 2005, the same day that Jacqueline filed her complaint for divorce. A month later, Charles wrote an e-mail to Jacqueline from the Persian Gulf state of Qatar, where he was working as a government contractor. The e-mail assured Jacqueline that Charles would "try to make every effort to make this process as smooth as possible," and proposed to "split assets and liabilities up 50/50."

On February 24, 2006, the Worlands attended a settlement conference with Superior Court Judge Craig F. Stowers. The conference began on the record. The parties then negotiated off the record for several hours before reconvening to memorialize the agreement that they had reached.

Charles had traveled from Qatar for the settlement conference and at the outset he

complained that he had not had the opportunity to look over the house and the property inside. Charles voiced his suspicion that Jacqueline had "made hefty withdrawals from the joint account" maintained by the couple. And he disagreed with Jacqueline regarding the ownership rights to a 1991 Ford Explorer.

After negotiating off the record for several hours, the Worlands reached an agreement, which the superior court placed on the record. According to that agreement, the Worlands agreed to find a mutually acceptable appraiser for the house. They agreed that Charles would assume the mortgage and that Jacqueline would receive sixty percent of the value of the equity in the house. The Worlands agreed to split their four retirement accounts "50–50 by QDRO."[1] Charles consented "to [forgo] any claim to repayment for checks written by Ms. Worland since the date of separation," as well as "payments that he paid on the house" up until the time of the settlement conference. Jacqueline, in turn, agreed to forgo spousal support and to make mortgage payments until she would leave the house on May 31, 2006. Finally, Charles agreed to pay $2,000 of Jacqueline's attorney's fees. At the conclusion of the conference, the superior court told the Worlands:

> Now, I want everyone to understand—and the attorneys are going to ask you these questions—but once you agree that this is your agreement, and you are going to have to acknowledge that you've given this careful and deliberate thought, and you've had a chance to talk to your attorneys and get their counsel and ask them whatever questions you have. But once you agree that this is your deal, this is your deal today, and it's your final deal. One or the other of the lawyers will agree to prepare the findings and conclusions that will memorialize the terms. But in the event that there may be some disagreement later about what it is that they've written down, in terms of the written document that memorializes the terms—the terms that actu-

ally control will be what we put on the record today.

Both Worlands then gave sworn testimony. Charles's endorsement of the agreement appears unequivocal:

> COUNSEL: Okay. And you've heard the agreement that the judge restated. Is that your complete agreement?
>
> CHARLES: Yes.
>
> COUNSEL: As far as settling all outstanding issues in this divorce case?
>
> CHARLES: Yes.
>
> COUNSEL: And is there anything else that wasn't included in that agreement?
>
> CHARLES: No.
>
> COUNSEL: Okay. Has anyone forced you into coming into this agreement?
>
> CHARLES: No.
>
> COUNSEL: Made any threats? Any promises?
>
> CHARLES: No.
>
> COUNSEL: Are you under the influence of anything that would impair your ability to make this decision?
>
> CHARLES: No.
>
> COUNSEL: Do you think this is a fair and equitable division of your assets and debts?
>
> CHARLES: Yes.
>
> COUNSEL: And is this something that you are voluntarily entering into at this time?
>
> CHARLES: Yes.

Jacqueline similarly testified that the agreement was "a fair and equitable division" of their marital property.

After the settlement conference, Charles paid $2,000 of Jacqueline's attorney's fees. As they had agreed to do on the record, Charles filed proposed findings of fact and conclusions of law, accompanied by a property division chart. Jacqueline filed draft QDROs for the four pensions at issue in the divorce. Weeks after placing the settlement on the record, Charles took issue with the

---

1. QDROs, or Qualified Domestic Relations Orders, direct a retirement plan administrator to distribute the benefits of a retirement plan according to the percentages agreed upon by the parties and approved by a court. *See generally* Gale S. Finley, Assigning Retirement Benefits in Divorce 1–12 (2d ed.1999).

proposed QDRO of his military pension, and on May 22, 2006, he filed his own proposed version. Jacqueline objected to the new proposed QDROs saddling her with the entire cost of creating a survivorship benefit. The Worlands also failed to agree on who should conduct an appraisal of the marital home, and they eventually obtained two separate appraisals that differed by approximately $13,000. On July 11, 2006, Jacqueline moved for a hearing to resolve these disputes, and the superior court granted the motion.

On November 7, 2006, the Worlands, both with new attorneys, appeared again in superior court before Judge Stowers. On December 27, 2006, with the aid of his new lawyer, Charles filed a "Notice of Misrepresentation by Opposing Counsel," arguing that "Mr. Worland asserted and continues to assert that there was no settlement and the [superior court] should not execute the [f]indings, but should order a [t]rial." The superior court disagreed, however, and on March 10, 2007, it issued a decree of divorce and its amended findings of fact and conclusions of law. In its findings, the superior court determined that the Worlands "should use the average value between the two appraisals" that they had commissioned. The superior court also determined that the Worlands should equally share the cost of creating a survivorship benefit for the pensions. Finally, the superior court divided the Worlands' credit card debt between them, following the assignment of that debt outlined in the property division table previously submitted by Charles.

On May 10, 2007, the superior court issued a Qualifying Military Order to divide Charles's military pension, as well as QDROs to equally divide the Worlands' other pensions, and an order that Charles "refinance the marital home and pay Ms. Worland 60% of her equity within 45[ ]days of this order." On May 21 Charles filed a motion for reconsideration. Among other claims, he asserted

that the superior court had wrongfully included his Teamster pension in its distribution. On May 31 Jacqueline filed a response in which she opposed Charles's motion for reconsideration and moved for attorney's fees. On June 4, 2007, Charles opposed any award of attorney's fees on the ground that Jacqueline's motion for fees was untimely.

The superior court denied Charles's motion for reconsideration and ordered additional briefing on the attorney's fees issue. After receiving additional briefing from both sides, the court granted Jacqueline's motion for attorney's fees on December 2. The court found that Charles "unreasonably protracted and added to the litigation following the parties' settlement," because "[a]mong other things," Charles "unilaterally retained an appraiser," "unreasonably opposed plaintiff's proposed QDROs," and "persists in his argument that there was not [a] settlement, even though the record could not be any clearer that both parties entered into a knowing, voluntary settlement." The superior court awarded Jacqueline $14,790.20, the entirety of her "reasonably and necessarily incurred attorney's fees to enforce the parties' agreement." [2]

Charles appeals.

### III. STANDARD OF REVIEW

 When reviewing a divorce proceeding, we "will reverse an allocation decision only if the trial court abuses its discretion in allocating the property, and then only if the allocation is clearly unjust." [3] We review a lower court's decision to enforce a settlement agreement under the abuse of discretion standard.[4] We review a trial court's award of attorney's fees in a divorce proceeding under that standard as well,[5] meaning that we will uphold the superior court's decision unless the record as a whole leaves us with a definite and firm conviction that the trial court committed a mistake.[6]

---

**2.** *See* Alaska R. Civ. P. 82(b)(3).

**3.** *Jones v. Jones,* 835 P.2d 1173, 1175 (Alaska 1992).

**4.** *Mullins v. Oates,* 179 P.3d 930, 935 (Alaska 2008).

**5.** *Johnson v. Johnson,* 564 P.2d 71, 76–77 (Alaska 1977).

**6.** *Hopper v. Hopper,* 171 P.3d 124, 128 (Alaska 2007).

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion in Enforcing the Worlands' Settlement Agreement.

According to Charles, the agreement he reached with Jacqueline at the settlement conference omitted material terms. He also alleges that both parties sought to nullify the agreement and proceed to trial. Jacqueline defends the agreement and points out that she only sought trial in the event that the superior court rejected her challenges to the home appraisal and the division of Charles's military pension. The record supports this latter version of events.

Charles recites a list of purportedly overlooked items of property as evidence of the Worlands' failure to reach a settlement. He leads this list with the claim that Jacqueline extracted funds from the couple's joint accounts. But as Charles points out in his brief, he "made known" to the superior court his allegations that Jacqueline had improperly drained marital assets.[7] And after the parties negotiated off the record for over four hours, Charles agreed under oath "to [forgo] any claim to repayment for checks written by Ms. Worland since the date of separation, and likewise . . . any claim to repayment for mortgage payments that he paid on the house from the date of separation through February 2006," the time of the settlement. Charles fails to explain how this term of the settlement agreement does not bar his claim here.

The other items on Charles's list of neglected issues follow the same pattern. For example, he alleges that the parties had "no agreement on a tax credit relating to the equity distribution." According to the record, however, Jacqueline agreed to continue paying the mortgage for three months and therefore planned to take a commensurate interest deduction from her taxable income the following year.[8] Charles testified that this arrangement, along with the rest of the settlement terms, represented "a fair and equitable division" of the marital property. Charles's arguments invoking the Ford Explorer, the couple's joint bank account, and his personal property similarly fail upon inspection of the record. And Charles's allegation that "Ms. Worland failed to pay even one cent on the mortgage despite agreement to do so" identifies a potential failure to comply with the terms of the settlement but exposes no flaw in the settlement itself.

Charles also alleges that the parties failed to reach an agreement on the home valuation and that this failure necessitates trial. He argues that "there is absolutely no evidence whatsoever that Mr. Worland accepted the $261,500.00 value for the home."[9] But the

---

7. While the parties were still on record before they engaged in their off-record negotiations, Charles's attorney explained his concern:

 COUNSEL: Because what we're saying is that separate funds were used to pay off the debt. Separate funds from Mr. Worland, as he was depositing money in the joint bank account after date of separation. Those funds were used to pay that debt down. And he takes . . . issue with a lot of stuff that was done with that money that he was depositing in the account. . . . So I think he has a problem with not getting any credit for some of the money that he was working hard to make, being used to pay off a debt.
 COURT: Okay. And I understand that this is going to be a point of big contention here.
 COUNSEL: Sure.
 COURT: And I think that probably the best way to deal with that is to do that separately, because I can see things getting bogged down. . . .
 COUNSEL: Sure.
 Later, after several hours of negotiations, Charles agreed on the record to forgo these claims.

8. Jacqueline's lawyer was careful to put this arrangement on the record:

 COURT: Anything else, Ms. Foley?
 COUNSEL: Yes. My client is supposed to be able to stay in the house until May 31st.
 COURT: Yes, I said that, I think.
 COUNSEL: And, um, she would be responsible for the mortgage and utilities for March, April and May.
 COURT: Yes. March, April and May.
 COUNSEL: Which means she should be able to take that interest deduction the next year.
 COURT: Yes, she can.
 Charles raised no objection to this arrangement.

9. Charles's property division table nevertheless cites $261,500 as the value for the home. Charles also erroneously attributes the 2006 mortgage interest deduction to Jacqueline. As their agreement makes clear, however, she can claim a deduction for only the three months that she paid the mortgage. Jacqueline's appendix corrects this oversight.

record demonstrates that Charles did agree to accept the valuation of a mutually acceptable appraiser. The Worlands never succeeded in choosing such an appraiser. Instead, Charles contracted with one appraiser, and Jacqueline contracted with a second appraiser, chosen from a list that Charles had previously provided after the settlement conference. Given the Worlands' inability to agree upon a single appraiser, basing the marital home's value on the average of the two separate appraisals reasonably effectuated the Worlands' intent, avoiding the cost and delay of trial.

Charles argues that a trial was necessary to determine who should bear the costs of establishing a survivorship benefit from Charles's military pension. But the record of the settlement conference makes clear that all of the Worlands' retirement accounts were to "be split 50–50 by QDRO," and that "[t]he military QDRO shall include, calculated in[,] the survivor benefit cost." Charles also cites disputes surrounding various credit card accounts, a cash balance in "Ms. Worland's extra credit account," and a $5,000 debt to the Internal Revenue Service. But the tax debt of $4,154 arose after the settlement conference; the parties did not receive notice of the debt until October 10, 2006, several months after the settlement conference, and according to Jacqueline, "[t]he division of this post-settlement debt . . . remains to be resolved by agreement of the parties or by the trial court." With respect to the Worlands' credit card debt, Charles's pretrial property division spreadsheets and his proposed findings of facts submitted after the settlement conference indicated that he would assume the credit card debts he now disputes. Charles appears to concede this point in his reply brief, admitting that "both parties' spreadsheets at the time of the settlement conference evidence that Mr. Wor-

land would pay the [disputed] credit card debt."

Finally, Charles argues that he "succumbed to the pressure from his counsel and the [superior court] to proceed with the settlement discussions despite his repeated requests that they be terminated," in light of his "flying in excess of 20 hours to reach the settlement discussions." As a result, he alleges that "the settlement was achieved under coercion and duress." Charles relies on *Gravel v. Alaskan Village, Inc.*[10] for the proposition that we should set aside the settlement and remand the case for trial. But *Gravel* directly undermines Charles's claim. In that case, we concluded that "[t]he record simply does not support appellant's contention that he was deprived of his free will and induced to settle the case under coercion and duress."[11] As in *Gravel,* the record in this case fails to support Charles's contention of coercion and duress. Charles's testimony on record leaves little doubt that he fully engaged in settlement discussions with the assistance of counsel and accepted the terms on which the two sides agreed. Indeed, his counsel specifically asked Charles, "Has anyone forced you into coming into this agreement?" And Charles testified that no such coercion had taken place.

█ Our case law has repeatedly affirmed the "strong public policy in favor of the settlement of disputes."[12] Settlements "simplify, shorten and settle litigation without taking up valuable court resources."[13] As contracts, settlement agreements "must be entered into voluntarily and knowingly; they cannot be the product of coercion, duress, or misrepresentation."[14] But the length of the Worlands' settlement negotiations, Charles's assistance by counsel, and the fact that Charles "affirmatively participated in clarifying and defining several of the settlement's terms,"[15] belie any claim

---

10. 423 P.2d 273 (Alaska 1967).

11. *Id.* at 277.

12. *Mullins v. Oates,* 179 P.3d 930, 937 (Alaska 2008) (quoting *Municipality of Anchorage v. Schneider,* 685 P.2d 94, 98 (Alaska 1984)); *see also Murphy v. Murphy,* 812 P.2d 960, 965 (Alaska 1991).

13. *Interior Credit Bureau, Inc. v. Bussing,* 559 P.2d 104, 106 (Alaska 1977).

14. *Mullins,* 179 P.3d at 937.

15. *Id.; see also Ford v. Ford,* 68 P.3d 1258, 1264 (Alaska 2003) (noting that it was proper to conclude that party was bound by settlement because that party actively participated in the set-

that Charles did not enter into the agreement voluntarily and of his own free will.

## B. The Superior Court Divided the Marital Property in a Fair and Equitable Manner.

■ As support for his argument that the superior court failed to distribute the marital property in an equitable fashion, Charles recites the same allegations listed in his argument that the parties failed to reach a settlement. These allegations fail to advance Charles's claims of inequity for the same reasons that they fail to advance his claim that a settlement was not reached. In his reply brief, Charles declines to address Jacqueline's contention that the disparity between the former spouses' earning capacities might have justified a more favorable division for her. According to Jacqueline, she earns $37,500 as a bus driver in Anchorage, while Charles has earned over $100,000 annually as a contractor in the Middle East.

Charles argues that the superior court "effectively reversed itself absent [a h]earing and required Mr. Worland in [the] final division of property to make the mortgage payment despite its earlier [o]rder requiring Ms. Worland to do so." But Charles fails to specify which mortgage payments the superior court wrongfully obliged him to pay. The agreement on record assigns responsibility to Jacqueline for the March, April, and May mortgage payments of 2006. The superior court's order did not alter this term, and thus Charles's claim for any relief from mortgage payments apart from those three months must fail. In a similar vein, Charles argues that the superior court abused its discretion by failing to take into account "whether credits and offsets should be given for post-separation mortgage payments," and by declining "to impute the rental value of Ms.

Worland's exclusive use of the marital residence after separation in dividing the marital estate." But the superior court did not abuse its discretion; it simply enforced the terms of the parties' mutually agreed upon settlement. Indeed, none of the cases cited by Charles in support of his argument involved settlement discussions.[16]

## C. The Superior Court Did Not Abuse Its Discretion in Awarding Attorney's Fees to Jacqueline.

■ Charles argues that the superior court's award of attorney's fees to Jacqueline was an abuse of discretion because Jacqueline failed to timely file her motion for attorney's fees and because the underlying award was unreasonable. Charles points out that Jacqueline filed her motion for attorney's fees on May 31, 2007, twenty-one days after the superior court issued its order of May 10, 2007, which required Charles to refinance the marital home and pay Jacqueline sixty percent of her equity in the property. Charles reasons that Alaska Rule of Civil Procedure 82(c)'s requirement that a litigant file for attorney's fees "within 10 days after the date shown in the clerk's certificate of distribution on the judgment" bars the trial court's award of attorney's fees.

Charles is correct that Civil Rule 82(c) requires that a motion for attorney's fees "must be filed" within ten days of distribution of the judgment. And our rules direct a litigant to file a motion for enlargement of time before an applicable deadline expires. Alaska Rule of Civil Procedure 6(b)(1) gives a trial court discretion to enlarge the time period for filing a motion "if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order." But even if the litigant fails to file a request for extension before the

---

tlement discussions); *Pavek v. Curran,* 754 P.2d 1125, 1127 (Alaska 1988) (noting that it was proper to conclude that party was bound by settlement agreement when that party was present at settlement hearing, made no objection to terms of agreement, and did not in any way indicate that she did not understand settlement).

16. Specifically Charles cites *Korn v. Korn,* 46 P.3d 1021, 1022 (Alaska 2002) (remanding because "interim spousal support and imputed

rental value are not actually marital property and trial court did not explain why it counted them as marital property" after it "held a trial on disputed property questions and issued its final decision dividing the couple's marital property"); *Ramsey v. Ramsey,* 834 P.2d 807, 808 (Alaska 1992) (rejecting trial court's finding that parties functioned as single economic unit after separation); and *Ogard v. Ogard,* 808 P.2d 815 (Alaska 1991) (no settlement involved).

deadline expires, a trial court retains some discretion to grant the request for extension. Alaska Rule of Civil Procedure 6(b)(2) gives the trial court discretion to extend most deadlines [17] "upon motion made after the expiration of the specified period [for filing] ... where the failure to act was the result of excusable neglect."

■ Thus, ordinarily, a party seeking an enlargement of time under Civil Rule 6(b) must file the request for extension before the initial filing deadline. But where a party misses that deadline, the party must file a request to allow the late filing, setting forth an explanation of why the untimely filing resulted from excusable neglect.[18] Here, Jacqueline filed no motion at all: she simply moved for attorney's fees after the ten-day deadline, failing even to acknowledge the untimeliness of her request. The trial court should have required Jacqueline to file a motion for extension that demonstrated excusable neglect or other good cause for failing to act in a timely manner in filing her motion for attorney's fees. This procedural error, however, was harmless. There was good cause for a post-expiration enlargement of time for filing because a timely motion for reconsideration was pending when the late-filed fee motion was filed. And the additional briefing on the attorney's fee issue ordered by the superior court allowed Charles to inform the court of any prejudice that he might suffer as a result of the motion's untimeliness.[19] We have repeatedly held that the "authority to enlarge the time allowable for an act pursuant to Rule 6(b) is a function addressed to the sound discretion of the trial

court."[20] The record does not suggest that the trial court abused that discretion here.

Put simply, nothing in our case law interpreting Rule 82(c) or Rule 6(b) supports adopting the rigid interpretation of the rule that Charles advocates. Our rules give the trial court discretion to accept a late-filed motion. Charles fails to allege any prejudice suffered as a result of the late filing or to demonstrate that the superior court abused its discretion. We therefore conclude that the superior court acted within its authority in granting Jacqueline's motion for attorney's fees.

Turning to the substance of the superior court's attorney's fees award, Charles argues that the superior court's "determination as to attorney's fees was manifestly unreasonable." The superior court couched its award in no uncertain terms, reasoning that Charles's "post-settlement litigation conduct was unreasonable, vexatious, ... done in bad faith ... unfair, and without basis in fact, law, or equity." Charles, however, disputes the trial court's finding that he engaged in bad faith or vexatious litigation as that standard is defined by our holding in *Kowalski v. Kowalski*.[21]

In *Kowalski*, we reversed an award of full attorney's fees because the trial court failed to adequately justify its award.[22] Specifically, the trial court in *Kowalski* based the award solely on its finding that the party " 'consumed a great deal more time than necessary [on the witness stand] by attempting to avoid and evade answers to even the questions posed by his own attorney.' "[23] We explained that "in making an increased fee award, the court must first determine

---

**17.** Under the rule, a court "may not extend the time for taking any action under Rules 50(b), 52(b), 59(b), and (e) and (f), and 60(b), except to the extent and under the conditions stated in them." Alaska R. Civ. P. 6(b)(2).

**18.** *See, e.g., Estate of Lampert Through Thurston v. Estate of Lampert Through Stauffer*, 896 P.2d 214, 218 (Alaska 1995).

**19.** When affirming a lower court's decision to enlarge the period for filing, we have cited the appellant's failure to explain how the extension "might prejudice him" or to discuss "prejudice on appeal." *Kaiser v. Sakata*, 40 P.3d 800, 806 (Alaska 2002). But we have also held that appel-

lants must show "more than a mere lack of prejudice" to justify reversal of a superior court's decision to deny an extension in the context of Rule 60(b). *Dickerson v. Goodman*, 161 P.3d 1205, 1207 (Alaska 2007).

**20.** *Estate of Lampert*, 896 P.2d at 218 (quoting *State v. 1.163 Acres, More or Less*, 449 P.2d 776, 779 (Alaska 1968)).

**21.** 806 P.2d 1368, 1373 (Alaska 1991).

**22.** *Id.* at 1372–73.

**23.** *Id.*

what fee award would be appropriate under the general rule, and only then increase the award to account for a party's misconduct." [24] We also directed the lower court to "make explicit findings of bad faith or vexatious conduct and clearly explain its reasons for deviating from the general rule." [25]

The superior court's analysis in this case complies with the strictures of *Kowalski*. The trial court found that the general rule would operate to award Jacqueline twenty-five percent of her post-settlement litigation fees. It based this finding on Charles's agreement at settlement to pay $2,000 of Jacqueline's attorney's fees, which the trial court took to signify "an implicit, if not explicit, recognition that the parties' economic circumstances were not equal." But Charles's litigation tactics and his efforts to set aside the settlement agreement led the superior court to charge him with full reasonable fees arising out of the post-settlement pleadings:

> The court agrees with plaintiff's arguments that defendant has unreasonably protracted and added to the litigation following the parties' settlement. Among other things, defendant unilaterally retained an appraiser instead of jointly selecting one as the parties agreed. Defendant unreasonably opposed plaintiff's proposed QDROs and the issue of survivor benefits. Defendant persists in his argument that there was not settlement, even though the record could not be any clearer that both parties entered into a knowing, voluntary settlement. . . .
>
> . . . If the court was correct in enforcing the settlement (which it believes it was), then all of the post-settlement litigation caused by defendant is unreasonable and is calculated to delay/impede/undo/thwart the parties' settlement agreement and plaintiff's rights thereunder.

Accordingly, the superior court awarded Jacqueline fees of $14,790.20, which it found were "reasonably incurred by plaintiff in attempting to enforce and receive the benefits of her settlement agreement with the defendant."

We agree with the superior court's characterization of Charles's litigation conduct. In his motions below and, indeed in this appeal, Charles has launched a series of unsubstantiated allegations and legally baseless claims. His arguments regarding the issues identified by the superior court—including appraisal of the marital home, the cost of the survivor benefits for the military pension, and the validity of the settlement proceedings—bolster the superior court's judgment that Charles unreasonably protracted this litigation. Accordingly, we conclude that the superior court acted within its discretion in awarding attorney's fees to Jacqueline.

## V. CONCLUSION

For the reasons detailed above, we AFFIRM the judgment of the superior court.