*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CYNTHIA J. NOTTI, | ) | |
| | ) | Supreme Court No. S-17560 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-18-05567 CI |
| v. | ) | |
| | ) | O P I N I O N |
| DAVID G. HOFFMAN, | ) | |
| | ) | No. 7603 – July 15, 2022 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Daniel W. Hickey, Gruenstein, Hickey, Havelock & Duffy, Anchorage, for Appellant. Mera Matthews, Cashion Gilmore LLC, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

CARNEY, Justice.

## I.    INTRODUCTION

A divorcing couple settled their property dispute by executing a settlement agreement that included a litigation waiver. The superior court accepted the settlement five months later. The woman subsequently sued her former husband, alleging tort claims based upon actions taken in the months between the time the agreement was executed and when it was accepted. The superior court granted the man's motions to

dismiss and for summary judgment. The woman appeals. We agree with the superior court that one of the torts alleged by the woman does not exist in Alaska, and we affirm the superior court's order dismissing that claim. But because the settlement agreement was effective between the parties when signed, even though it was subject to court approval, we reverse the superior court's grant of summary judgment regarding the other torts and remand for further proceedings on those issues.

## II. FACTS AND PROCEEDINGS

### A. Facts

Cynthia Notti and David Hoffman married in 2012. Their relationship was tumultuous; Hoffman repeatedly initiated divorce proceedings. After two reconciliations Hoffman initiated divorce proceedings for a third time in November 2015. The superior court scheduled a hearing in the matter for May 2016. In December 2015 Notti and Hoffman reached an agreement to settle the division of marital property. The settlement agreement also contained a litigation waiver. The waiver stated:

> Each party warrants that he or she, and any of his or her respective heirs, personal representatives or assigns, releases and discharges the other party, his or her respective heirs, personal representatives and assigns, from any and all claims and demands of every kind, nature and description, whether sounding in tort, contract, or equity, whether past, present, or future. The parties acknowledge that this agreement is intended to be a full, complete, and final settlement and release, and that neither party will at any time hereafter make or attempt to make any further claim against the other party, whether known or unknown at the time this agreement is executed.

Notti and Hoffman each signed the agreement, which was "[e]xecuted at Anchorage, Alaska this 31st day of December 2015" before a notary.

Hoffman asserts that he and Notti "continued to communicate amicably"

after the settlement. Notti disputes this, claiming that Hoffman continued to contact her seeking sex, which she refused unless he was "fully" committed to reconciling and "all in" on the marriage.

On March 28, 2016 Notti and Hoffman went to dinner and then had sex. Hoffman claims Notti initiated the sexual encounter. Notti disagrees, asserting that she agreed to engage in sexual relations only after Hoffman told her he was "all in" and put his wedding ring back on his finger. The following morning, Hoffman drove Notti to the airport for a previously planned vacation.

Notti returned from her trip on April 10; Hoffman picked her up from the airport. Notti claims that Hoffman informed her that he had not meant what he said on March 28, that he did not intend to reconcile, and that their encounter was "just sex" that "didn't mean anything" to him.

In the weeks before their May divorce hearing, Notti repeatedly told her attorney that Hoffman had "raped" her and that she believed she could sue him. Notti's attorney made Hoffman's aware of the rape allegation, but did not discuss any course of action based on the allegation. The settlement was modified to address concerns raised during the attorneys' discussions, but no changes were made with respect to the litigation waiver.

The settlement agreement, with Notti's and Hoffman's December 2015 signatures, was presented to the court at the May hearing. The parties advised the court that as a result of their continued discussions some modifications were necessary. The modifications were then made on the record; none were made to the litigation waiver.

The superior court accepted the settlement agreement, finding that "[t]he purpose of [the] agreement is to resolve all of the issues in this case" and that "the parties' agreement will accomplish that purpose." The court concluded that, as modified, the agreement was a "fair and equitable way to divide the marital estate" and ordered the

estate divided as indicated in the agreement. Before entering the decree of divorce, the court specifically found that "[b]oth parties had sufficient time to think about [the agreement] and sufficient information" regarding "their rights and responsibilities under the agreement" and "the legal consequences of what they were doing."

### B. Notti's Civil Suit

A month later Notti called Hoffman to tell him she was going to file a civil suit for "borderline rape." On March 27, 2018 Notti filed a complaint alleging three causes of action arising from the March 28, 2016 encounter. She later amended the complaint to allege sexual assault, which she termed "rape by fraud"; misrepresentation; and intentional infliction of emotional distress.

Hoffman answered in June, denying all claims. He moved for summary judgment in late December, arguing that Notti's claims were barred by the litigation waiver in the settlement agreement.

Notti responded with a cross-motion for partial summary adjudication, asserting that her lawsuit was not barred by the litigation waiver and "that no genuine issue of material fact exist[ed] to the contrary." In his response to Notti's cross-motion, Hoffman also moved to dismiss Notti's rape by fraud claim for failure to state a claim. He argued that the tort did not exist in Alaska. Notti opposed the motion to dismiss. The superior court scheduled oral argument on all of the pending motions in May 2019.

### C. Decision On Motions

In a written decision following oral argument, the superior court first addressed Hoffman's motion to dismiss. After "assum[ing] for purposes of a motion to dismiss[] that Hoffman falsely stated that he had decided to remain married on Notti's terms," the court found that Notti's claim was "not actionable." The court's decision hinged on the distinction between "fraud in fact" and "fraud in the inducement." The court first concluded that fraud in fact — such as impersonating another in order to have

sex[1] — would be actionable because it involves "outright lies" that go "to the very definition and nature of the act for which one gives consent." In contrast, fraud in the inducement is not actionable because it could cover "a vast array of assertions made by a person who is exploring the possibility of sexual activity with another." The court remarked that such communications "are almost by definition efforts to induce." The court determined that it was not necessary to "craft a definitive boundary" between the two types because "Hoffman's assertion that he wanted to remain in the marriage . . . is far from an imposter's deception about basic identity" and thus Notti's claim was "not actionable."

The superior court then turned to Hoffman's motion for summary judgment. The court explained that it would first determine the date on which the agreement took effect because that would determine whether and how it was intended to apply to the March 2016 conduct. If the agreement took effect when the parties signed it in December 2015, the court would have to decide whether the release applied to subsequent misconduct. And if the agreement took effect when the divorce decree was entered in May 2016, the court would have to determine if the release applied to conduct that happened after it was signed but before the court entered the divorce decree.

The court concluded that the settlement agreement took effect in May 2016 when it was accepted and made part of the divorce decree with the finding that "the parties' settlement agreement . . . is a fair and equitable way to divide the marital estate." The court based its conclusion on its statutory power to effectuate divorce and its "affirmative obligation to 'fairly allocate the economic effect of divorce.' "[2] It reasoned that this obligation requires a superior court to "evaluate and approve a proposed

---

[1]    *See, e.g.*, *State v. Kelso-Christy*, 911 N.W.2d 663, 664-65 (Iowa 2018).

[2]    AS 25.24.160(a)(4).

property settlement." The December 2015 agreement therefore did not become enforceable until the superior court approved it after hearing from the parties.

The superior court also found that Notti and Hoffman knew the settlement agreement was not final when they signed it in December 2015 because each of them agreed to revisions between December and the May hearing. The court found that the time between their "tentative agreement and the trial court's approval of it . . . converted the conduct of March 2016 from a future (and obviously unknown) event (from the perspective of December 2015) to a past (and known) event (from the perspective of May 2016)." The court noted that Notti and Hoffman could have clarified that the release's "trigger date" was the date of the tentative agreement but chose not to. Because they had not done so, the court found that "the release became effective no sooner than the May 2016 hearing."

The superior court proceeded to interpret the release, citing *Philbin v. Matanuska-Susitna Borough* for our instruction that "the focus is on what a reasonable person would have understood the release language to have meant."[3] The court found that the "operative portion could not be broader," because it released "all claims and demands of every kind, nature[,] and description, whether sounding in tort, contract, or equity, whether past, present, or future." The court concluded that "[t]here is no question that a reasonable person would understand that the language of the release would apply to the . . . March 2016 conduct whether the release took effect in December 2015 or May 2016 . . . [as t]he release applied to both future and past torts." It also noted that from the perspective of May 2016, a reasonable person would have understood that the release of past torts encompassed the March 2016 conduct.

The court rejected Notti's "self-serving" claim that she intended the release

---

[3]      991 P.2d 1263, 1266-67 (Alaska 1999).

to apply only to behavior that predated the agreement, noting that her argument did not "square with the language of the release." The court cited earlier cases that "caution[] trial courts not to give significant weight to a litigant's assertion of subjective understanding about the meaning of contract language that is in stark contrast to the objective meaning of language."[4] The court explained that "[t]hese self-serving assertions do not create issues of fact in the face of very clear contract language."

Notti appeals the court's order granting the motion to dismiss and the motion for summary judgment.

## III. STANDARD OF REVIEW

We review grants of summary judgment and motions to dismiss de novo.[5] "After the court makes reasonable inferences from the evidence in favor of the non-moving party, summary judgment is appropriate only when no reasonable person could discern a genuine factual dispute on a material issue."[6]

---

[4] *See Kay v. Danbar, Inc.*, 132 P.3d 262, 269 (Alaska 2006); *Dimeff v. Estate of Cowan*, 300 P.3d 1, 11 (Alaska 2013) ("We have explained that '[d]ifferences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract since such self-serving statements are not considered conclusive.' " (internal citations omitted) (quoting *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981))).

[5] *See Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 25 (Alaska 2020) ("We review a grant of summary judgment de novo." (quoting *Blair v. Fed. Ins. Co.*, 433 P.3d 1048, 1051 (Alaska 2018))); *DeRemer v. Turnbull*, 453 P.3d 193, 196 (Alaska 2019) ("We review de novo decisions granting motions to dismiss.").

[6] *Cook Inlet Fisherman's Fund v. State, Dep't of Fish & Game*, 357 P.3d 789, 797 n.15 (Alaska 2015) (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014)).

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Dismissing Notti's Claim Of "Rape By Fraud."

Notti argues that the superior court erred when it granted Hoffman's motion to dismiss her tort claim for personal injuries due to "rape by fraud." She asserts that the tort is a "claim sounding in battery." She also contends that our prior case *Taylor v. Johnston*[7] allows her claim, although the superior court concluded — and Notti conceded — that "no Alaska authority . . . expressly supported her assertion of such a tort." Notti characterizes *Taylor* as holding that "a consent to a touching does not preclude a claim for battery if consent was obtained via a misrepresentation regarding the actor's identity." Even assuming, *arguendo*, that Notti accurately interprets our decision, it does not provide the support she claims. Alaska law does not recognize a tort of "rape by fraud."

To prove battery a plaintiff must show that (1) the defendant "act[ed] intending to cause a harmful or offensive contact with the person of another"; (2) "the latter [was] put in imminent apprehension of such a contact"; and (3) "an offensive contact result[ed]."[8] In *Taylor*, a patient sued his doctor and moved to amend his complaint to include a tort of "battery by medical fraud," based on his belief that the doctor had not been properly licensed.[9] The superior court denied the amendment and concluded that no such tort existed.[10] We affirmed the superior court's denial on an

---

[7] 985 P.2d 460 (Alaska 1999).

[8] *Id.* at 464 (quoting *Merrill v. Faltin*, 430 P.2d 913, 917 (Alaska 1967) (citing RESTATEMENT (SECOND) OF TORTS §§ 18, 21, 34 cmt. a (1965))).

[9] *Id.* at 462-63.

[10] *Id.* at 463.

alternate ground: the doctor was in fact licensed.[11] But we observed, in dicta, that "a battery claim may lie if a person falsely claiming to be a physician touches a patient, even for the purpose of providing medical assistance."[12]

As Notti argues, our observation in *Taylor* does recognize that a battery claim may be premised upon misrepresentation, even if the person making the claim consented to be touched. But the alleged battery by a person impersonating a physician is a far cry from the consensual contact between Notti and Hoffman. Moreover, unlike the claim alleged by Notti, the specific misrepresentation alleged in *Taylor* is illegal under Alaska law and can lead to criminal charges.[13]

Assuming, as the superior court did, that Hoffman lied to Notti when he said he had decided to remain married, his falsehood did not mislead Notti about the nature of the touching to which she consented. In his reply to Notti's opposition to dismiss, and his brief before us, Hoffman argues that there is a critical difference between "fraud in fact" and "fraud in the inducement." This difference, Hoffman asserts, should determine whether a misrepresentation amounts to battery. He urges us to consider an Iowa case, *State v. Kelso-Christy*,[14] as an example of "fraud in fact" as opposed to the "fraud in the inducement" Notti alleges with respect to sexual contact.

In *Kelso-Christy*, a man created a false Facebook identity, where he posed

---

[11]    *Id.* at 464-65.

[12]    *Id.* at 465.

[13]    *See* AS 08.64.360 ("Except for a physician assistant or a person licensed or authorized under another law of the state who engages in practices for which that person is licensed or authorized under that law, a person practicing medicine or osteopathy in the state without a valid license or permit is guilty of a class A misdemeanor.").

[14]    911 N.W.2d 663 (Iowa 2018).

as another actual person and contacted several acquaintances of that person.[15] One woman, believing she was in contact with her high school acquaintance, agreed to a sexual encounter with the man while she was blindfolded and handcuffed.[16] The man came to her home where she was already blindfolded.[17] They had sex and the man left before she removed the blindfold.[18] She later learned he was an imposter and the man was charged and convicted of burglary because he entered her home with the intent to commit sexual assault.[19]

On appeal, the man argued that he had not intended to commit sexual assault because the woman had consented.[20] An intermediate appellate court affirmed his conviction, concluding that she had only consented to have sex with the man she knew from high school, not with the imposter.[21] The Iowa Supreme Court affirmed.[22]

As part of its analysis in *Kelso-Christy*, the Iowa Supreme Court reviewed its prior decision in *State v. Bolsinger* which had "acknowledged that some forms of deception are substantial enough to negate a prior consent."[23] In *Bolsinger*, the court had

---

[15]    *Id.* at 664.

[16]    *Id.* at 665.

[17]    *Id.*

[18]    *Id.*

[19]    *Id.* at 665-66.

[20]    *Id.* at 666.

[21]    *Id.*

[22]    *Id.* at 673.

[23]    *Id.* at 665 (discussing *State v. Bolsinger*, 709 N.W.2d 560, 564 (Iowa
(continued...)

said:

> If an act is done that is different from the act the defendant said he would perform, this is fraud in fact. If the act is done as the defendant stated it would be, but it is for some collateral or ulterior purpose, this is fraud in the inducement. Fraud in fact vitiates consent; fraud in the inducement does not.[24]

In view of that precedent, the *Kelso-Christy* court concluded:

> [C]onsent to engage in a sexual act with one person is not consent to engage in the same act with another actor. Deception in this context is not collateral in any way, but goes to the very heart of the act. When a person is deceived as to who is performing the previously consented to act, the person ultimately experiences an entirely separate act than what was originally agreed to.[25]

The line between fraud in fact and fraud in the inducement can admittedly be difficult to draw. But, as Hoffman points out, *Kelso-Christy* provides helpful guidance to differentiate the two in the context of sexual encounters. When the fact of the identity of one of the actors is misrepresented, that deception "goes to the very heart of the act."[26] But here there is no misrepresentation about the actors or the act itself. Rather, it was Hoffman's allegedly fraudulent assurance that he would remain married which induced Notti to engage in the agreed-upon act, rather than a misrepresentation regarding his identity or the act itself. As the superior court noted, "communications between persons before sexual activity are almost by definition efforts to induce." We

---

[23]     (...continued)
2006)).

[24]     *Bolsinger*, 709 N.W.2d at 564.

[25]     *Kelso-Christy*, 911 N.W.2d at 670.

[26]     *Id.*

agree with the superior court that "Hoffman's [allegedly] false assertion in the context of the parties' inconstant relationship is not actionable."

**B.    The Superior Court Erred By Concluding The Settlement Agreement Was Not Enforceable Between The Parties When Signed.**

The superior court determined that "[t]he parties' December 2015 agreement did not become enforceable as soon as they agreed to . . . its terms"; instead the agreement became effective in May 2016, when the parties "obtain[ed] the approval of the judge presiding over the divorce." The court then determined that the litigation waiver barred claims against Hoffman based on his March 2016 conduct, which had occurred two months before the waiver's effective date. Notti appeals the superior court's grant of summary judgment. She argues that the superior court erred by concluding that the separation agreement was not effective when signed by the parties in December 2015, and by subsequently finding that the waiver applied to the March 2016 conduct.

We have observed that "[c]ourts will treat settlement agreements as contracts provided they meet minimal contractual requirements."[27] And "[w]here a settlement agreement relating to the division of property meets basic contractual requirements, it should be enforced, absent 'fraud, duress, concealment of assets or other facts showing the agreement was not made voluntarily and with full understanding.' "[28] Once the property settlement is approved and incorporated into a divorce decree it is "merged into the decree, so that the rights of the parties derive from the decree, not the

---

[27]    *Crane v. Crane*, 986 P.2d 881, 885 (Alaska 1999).

[28]    *Colton v. Colton*, 244 P.3d 1121, 1129 (Alaska 2010) (quoting *Murphy v. Murphy*, 812 P.2d 960, 965 (Alaska 1991)).

agreement."[29]

Although "[w]e have repeatedly held that a property settlement agreement incorporated into a divorce decree merges with that decree,"[30] we have also held that parties are bound by the terms of an executed settlement agreement, even if it has not yet merged with the divorce decree. For example, in *Notkin v. Notkin*, a husband and wife began divorce proceedings; as part of those proceedings the parties executed a property settlement agreement and filed it with the superior court.[31] Prior to the superior court's approval of the agreement, the woman had second thoughts and made a motion to set the agreement aside.[32] The superior court granted the motion, and the man appealed.[33] We reiterated that a valid separation agreement is "controlling in the absence of . . . facts showing that the agreement was not made . . . *with full understanding*."[34] The record reflected that the woman, who was "not fully conversant in English," had "lacked a full understanding of the true nature and consequences of her actions at the time she entered into [the] agreement."[35] Rather than reversing the decision and instructing the court to simply refuse to approve a proposed settlement agreement — as would have been appropriate if the settlement agreement were not binding — we affirmed the superior

---

[29]     *Stone v. Stone*, 647 P.2d 582, 584 (Alaska 1982).

[30]     *Horchover v. Field*, 964 P.2d 1278, 1281 (Alaska 1998).

[31]     921 P.2d 1109, 1110 (Alaska 1996).

[32]     *Id.* at 1111.

[33]     *Id.*

[34]     *Id.* at 1111 (emphasis in original) (quoting *Kerslake v. Kerslake*, 609 P.2d 559, 560 n.1 (Alaska 1980)).

[35]     *Id.*

court's decision to set aside the finalized agreement before the divorce decree was entered.[36]

And in *Worland v. Worland* we affirmed the superior court's decision to enforce the terms of an executed settlement agreement before the decree of divorce had been entered.[37]  In that case, a husband and wife attended a settlement conference and reached a settlement agreement.[38]  Later, disputes arose as the parties began to divide their property according to the agreement.[39]  The husband asked the superior court not to enforce the terms of the settlement agreement but to allow him to go to trial.[40]  The superior court denied the request and issued a decree of divorce.[41]  On appeal, we emphasized that settlement agreements are binding contracts and that "[o]ur case law has repeatedly affirmed the 'strong public policy in favor of the settlement of disputes.' "[42] Because the parties had entered into a valid contract, its terms were enforceable upon execution; the superior court could not set the agreement aside, even though the decree of divorce had not yet been entered.[43]

Here, the parties executed a binding settlement agreement on December 31,

---

[36]     *Id.*

[37]     193 P.3d 735, 736, 739-41 (Alaska 2008).

[38]     *Id.* at 736-37.

[39]     *Id.* at 738.

[40]     *Id.*

[41]     *Id.*

[42]     *Id.* at 740 (quoting *Mullins v. Oates*, 179 P.3d 930, 937 (Alaska 2008)).

[43]     *See id.* at 739-41 ("Because the parties reached an enforceable property settlement agreement . . . we affirm the superior court's rulings . . . .").

2015. Just as in *Worland*, Notti and Hoffman's settlement agreement was enforceable between them when the parties signed it, even though it had not been accepted by the superior court and merged into the divorce decree.

The superior court also concluded that the parties' modification of the contract terms was proof that they "themselves understood that the December 2015 agreement was not final" until it had been approved by the superior court. But this reasoning is misplaced — contracting parties generally have an unlimited ability to agree to contract modifications.[44] The contract's enforceability is not changed simply because some provisions are modified during a court-approval process. The settlement agreement was a contract and became effective when the parties executed it, even though they later modified it.

The superior court erred by concluding that "as a matter of law [the agreement became] effective in May 2016." We reverse the superior court's grant of summary judgment and remand the motion for determination of whether Notti's remaining claims are barred by the litigation waiver contained in the settlement agreement, given the agreement's effective date of December 2015.[45]

---

[44] *See generally* 17A AM. JUR. 2D *Contracts* §§ 496, 500, 502, 505 (2022) (describing interplay between modified contract and original).

[45] The superior court noted that "[t]he release would apply to the March 2016 conduct whether the release took effect in December 2015 or May 2016." On appeal, Notti argues that the superior court erred by rejecting her assertion that she had only intended the waiver to apply to behavior which had occurred prior to December 31, 2015 and further erred by interpreting the litigation waiver to bar her suit. We agree with the superior court that the waiver's language could not be more clear: it released "any and all claims . . . past, present, or future." And the court correctly observed that a party's subjective intent expressed during litigation "do[es] not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not . . . probative." *Dimeff v. Estate of Cowan*,

(continued...)

## V.    CONCLUSION

We AFFIRM the superior court's order to dismiss the claim of "rape by fraud."  But we REVERSE the superior court's grant of summary judgment and REMAND to the superior court for determination of whether Notti's remaining claims are barred by the litigation waiver.

---

**45**    (...continued)
300 P.3d 1, 11 (Alaska 2013) (quoting *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981)).  However, because Notti's claims are based on conduct occurring after the waiver's effective date, the court should consider whether the waiver's bar on "future" claims would be enforceable against claims based on intentionally tortious conduct occurring after the waiver's effective date. *See Alleva v. Municipality of Anchorage*, 467 P.3d 1083, 1091 (Alaska 2020) (expressing uncertainty whether release limiting future liability would be enforceable against claims based on "grossly negligent conduct").